Breitel, J.
In an action by a wife for a separation, defendant husband appeals pursuant to CPLR 5601. (subd. [d]) from a judgment, entered after an order of the Appellate Division, dismissing his counterclaim for a divorce, and directing support for the wife. The issue, factual in nature, is whether the’ wife abandoned her husband.
*116 After a trial in the Supreme Court, the wife’s eontplaint seeking a separation was dismissed, and. the husband’s counterclaim for a divorce, based on her abandonment of him, was granted. The Appellate Division, disagreeing, among other things, with the finding of an abandonment by the wife, dismissed the husband’s counterclaim, but affirmed the dismissal of the wife’s complaint. Sinceihe finding of fact of abandonment was reversed, this court has the power and the duty to review the evidence on the issue oí fact (N. Y. Const., art. VI, § 3; CPLR 5501, subd. [b]).
This has been a protracted and bitterly fought litigation, with many pretrial proceedings, appeals, and substitutions of lawyers. There have also been posttrial proceedings and the present appeal. Extraneous legal and factual issues have been injected with a corresponding proliferation of. judicial opinions at nisi prius and in the Appellate Division. .But at this stage, there remains- only one paramount issue, that of abandonment by the wife.
Not involved, despite what may have been said in the courts below and by way of briefing in this court, is no-fault divorce (Domestic Relations Law, § 170, subds. [5], [6]). Gleason v. Gleason (26 N Y 2d 28) expressed the policy favoring judicial termination of “dead” marriages, based on the statute. No-fault divorce applies only where there is a previous decree of separation or a written separation agreement, as required by the statute. The parties have neither. A divorce may be obtained on this record only if fault is established, that is, if the wife unjustifiably abandoned her husband.
The credible evidence establishes abandonment by the wife. Consequently, the order of the Appellate Division should be modified to reinstate the judgment of the trial court divorcing the parties.
The parties were married September 7, 1960. Shortly after a two-month European honeymoon they established residence in Boca Raton, Florida, in a house then owned by Schine Enterprises, a family corporation. They have two children, Jeffrey, born May 26, 1962, and Gregory, born January 5, 1965.
Serious marital problems first arose in 1963. There were several separations, sometimes only geographical and sometimes because of estrangement. The parties had much to com *117 plain about one another and did. The wife evidently objected to the husband’s preoccupation with the troubled Schine business. The husband was unhappy with the wife’s extravagance and money exactions. There was conflict over personality traits. The parties in one sense were well-suited, and in another .sense doomed either to break up the marriage or destroy one another. It is hardly useful to detail their difficulties.
The upshot came in 1966. The parties were physically apart. The wife and children lived by this time in Kings Point, Long Island. The husband stayed in New York City embroiled in the foundering family business. Letters and telephone calls were being exchanged by the parties finding fault with one another. Then followed the denouement.
On August 12, 1966, the wife met the husband for dinner in New York City, and then drove him to his parents’ apartment. They argued and she says he refused to come to Kings Point for the weekend. She says she offered to stay for the night if she could leave early in the morning to take her son to a physician. The husband became angry and told her to go home because he did not wish to be awakened early. She says that his parting words were, “ I will see you in Court.”
The husband gave a different version, one credited by the trial court. He stated: ‘‘1 was completely shattered to hear from my wife that evening that she no longer wished to live with me, and that now that I had succeeded in salvaging the sale of our company’s properties, there would be plenty of money for me to turn over to her. She said that she didn’t want to live with me any more, that she was through, and was going to divorce me ”. \
In any event, the wife went back to Kings Point alone. The husband stated that he called her each day, including a two-hour telephone conversation on August 16, but that she~ refused to live with him. On August 17 he wrote her a letter, perhaps studied, which stated that he loved his wife and wanted the marriage to continue.
In late July or early August, 1966 a household employee lost the key to the entrance of the Kings Point residence. The wife changed the lock as a precaution, but did not give the husband a new key. The wife gave inconsistent statements whether she had offered her husband a new Jkey. In her verified *118 reply, she averred that she offered a key to her husband but he refused to accept it. On the trial, she testified in answer to the question- ‘ ‘ Did you tell your husband that you changed the lock on the front door? ”, that “ I frankly don’t remember whether I did or not.” Finally, she admitted: “ Frankly, the last thing in my mind was to even mention to him that the front door key — that this girl, this housekeeper of mine had lost the key,.and we changed the front lock.” He testified that he came to the house on September 3' and found that his key did not fit. He confronted the wife with the fact of the changed lock. She explained that the key had been lost and the lock replaced. He testified ‘ ‘ I said, ‘ All right; let me have the key.’ She said, ‘ No, you are not living here any more.’ ’’
The trial court properly disbelieved the wife’s testimony relating to the abandonment. Her descriptions of her husband’s behavior and their standard of living were exaggerated. She grossly distorted her expenditures, to establish a standard of living. She denied having independent means, but later admitted being the sole beneficiary of a trust fund valued at $167,000. She was demonstrably unreliable in many details, and gave incredible explanations of the course of conduct of the marriage. She, indeed, trifled with the truth, as three different Justices, including the Trial Justice, found at different nisi prius hearings.
The financial situation of the parties is partly obscured. The wife is the daughter of wealthy parents who made many gifts to her before and after the marriage. All during the separation her parents have lent or given her moneys to maintain a high standard of living. The husband is the son of wealthy parents whose nominal salary from the family corporations has been throughout at the approximate level of $26,000 per annum. The record is replete, however, with evidence that this Schine family lived on the family corporations, with homes, automobiles, food, services, and “ advances ” derived from the corporations. The standard of living for this Schine unit was well above $26,000. Interestingly, the Supreme Court in fixing the wife’s permanent support, after the last remand from the Appellate Division, set the amount -at $5,000 per annum. This sum, in addition to child support at $15,000 for both children, would take most of the husband’s nominal salary. Granting of a divorce on the husband’s counterclaim would deprive the wife. *119 of $5,000 animal support for herself, a small sum compared either to, the actual or exaggerated standard of living of the parties while married (or separated).
Section 170 of the Domestic Relations Law, as amended in 1966, provided: “ [A]n action for divorce may be maintained by a husband or wife to procure a judgment divorcing the parties and dissolving the marriage on any of the following grounds: * * * (2) The abandonment of the plaintiff by the defendant for a period of two or more years.”
The essence of abandonment is a refusal by one spouse to fulfill ‘ ‘ basic obligations springing from the marriage contract ” (Mirizio v. Mirizio, 242 N. Y. 74, 81, quoted in Diemer v. Diemer, 8 N Y 2d 206, 210). The conduct of a spouse to constitute abandonment must be unjustified and without the consent of the other spouse (Solomon v. Solomon, 290 N. Y. 337, 340, 342; Matter of Maiden, 284 N. Y. 429, 432-433).
Where the wife changes the lock on the entrance door of the marital abode, or where she insists on living, thus effectively excluding the husband, this act, unless justified, constitutes abandonment (see Fox v. Fox, 17 Misc 2d 998, 1002, affd. 17 A D 2d 939; Harris v. Harris, 46 Misc 2d 355, 356, 358; Ann., Divorce — Constructive Desertion, 19 ALR 2d 1428, 1462; cf. Seaman v. Seaman, 32 A D 2d 619).
The wife may have changed the door lock to the Kings Point residence, in the first instance, only for innocent reasons, but then she acted in conscious disregard of whether the husband would have access. She had a history of choosing, against his will, to live apart from her husband, and, by her own admission, of refusing to come with him when asked. When she consented, he was forced to meet her financial demands.
True, the husband was undoubtedly both immature and difficult. He had outbursts of temper, but these outbursts remained within the confines of the marriage, and, according to the wife’s testimony, did not grow worse over time. Occasionally, perhaps, he resented his wife’s attentions to the children and sought to make her choose between them and him. He talked about divorce and sometimes, for business reasons apparently, excluded his family from his life. They both talked to lawyers. But it was she who left without telling him where she was *120 in 1963. It was she who refused to stay with him in times of crisis. It was she who refused to participate in marriage counseling in the months preceding the final breakup. It was she who changed the lock to the Kings Point home and left her husband without a key. The weight of the evidence of abandonment was ample to sustain the trial judgment.
Accordingly, the order of the Appellate Division should be modified and the judgment of the Supreme Court divorcing the parties reinstated, without costs.