ISABEL A. McDERMOTT, Respondent, v FERGUS J. McDERMOTT, Appellant, and FIRE DEPARTMENT ARTICLE 1-B PENSION FUND OF THE CITY OF NEW YORK, Proposed Intervenor-Appellant.

Second Department, October 14, 1986

## APPEARANCES OF COUNSEL

*Joel R. Brandes* for appellant.

*Frederick A. O. Schwarz, Jr., Corporation Counsel (Larry A.*

*Sonnenshein* and *Edward F. X. Hart* of counsel), for proposed intervenor-appellant.

*E. Patricia Somerset, P. C.,* for respondent.

**OPINION OF THE COURT**

LAZER, J. P.

In her seemingly classic though recent study of the economic and social consequences of modern divorce laws, Professor Weitzman observes concerning pensions: "A divorced person who has been awarded a share of his or her spouse's pension may still face problems in collecting the benefit. One problem occurs if the worker elects to forego survivor's coverage. Under most pension plans, a worker can opt for a reduced pension to provide a survivor's benefit for his widow, or can opt for full monthly checks during his lifetime. Many workers elect to 'opt out' or waive survivor's coverage, and the choice has typically been theirs alone" (Weitzman, The Divorce Resolution, at 119).

At principal issue here is the power of the judicial system to limit the selection of payment options by a public employee whose pension rights are protected by particular constitutional and statutory provisions. The dispute also furnishes a further opportunity to examine how fundamentally the traditional nature of property rights have been altered for the marital relationship by the Legislature's creation of the "marital property" concept.

I

When their divorce action began, Fergus and Isabel McDermott had been married for 33 years, during almost all of which he held a position with the New York City Fire Department and she was a housewife. At the time of trial, he was 62 years old and Deputy Chief of the fire department with a salary of over $55,000 per year; she was 58, and apart from interest on a very small inheritance, her income was what he provided. Her rather severe health problems and lack of work experience made it highly unlikely that she could develop any meaningful earning potential in the future. His retirement was mandated at age 65.

In its divorce judgment, Special Term granted the wife a divorce on the ground of abandonment *(see,* Domestic Relations Law § 170 [2]); awarded her maintenance of $225 per

week to continue until the death of either party, her remarriage or the husband's retirement; directed the husband to maintain his existing medical coverage, or its equivalent, for her benefit; and awarded her counsel fees. Distribution of the marital property was sharply complicated, however, by the disproportion between the $317,269 value attributed to the husband's pension rights and the $136,191 value of the rest of the assets. The nonpension assets consisted of two jointly owned homes on Staten Island worth $59,000 and $27,500, three joint bank accounts containing approximately $5,565, three automobiles with a total worth of $2,600, and a stock portfolio and annuity worth $33,565 and $9,461, respectively, both in the husband's name. What was vigorously debated at Special Term and currently, of course, was the court's power to limit the husband's right to untrammeled selection of available pension payment options.

Under the fire department pension plan, pensioners may select from among a number of payment options. Under the "maximum allowance" option the husband was entitled to receive $35,193 per annum for life with $4,000 to be paid to his designated beneficiary at his death. Other options decreased the amounts payable per year but increased benefits to the designated survivors. "Option I" would provide $26,668 annually until death, with the designated beneficiary to receive a lump-sum payment of whatever was left in the reserve fund at the time of the pensioner's death. "Option II" would pay $23,484 annually until death, with the designated beneficiary to receive the same amount until his or her death. Designation of the Option II beneficiary would become irrevocable upon the pensioner's retirement and prior death of the beneficiary would extinguish the residuary benefits. "Option III" would provide a slightly higher annual allowance than Option II—$25,888—but would reduce the beneficiary's annual allowance to one half of what the husband would receive, $12,944. "Option IV" would allow the husband to convert a portion of the maximum allowance into life insurance, at a cost of $64.84 per $1,000 of insurance; the balance of the maximum allowance left after payment of these premiums would be paid to him.

Special Term (123 Misc 2d 355) awarded the wife the more valuable house plus a one-half interest in the joint bank accounts and the annuity; the husband got the other house, the stock portfolio, the three automobiles and retained the other half of the bank accounts and the annuity. In distribut-

ing the pension rights, the court awarded the wife a one-half interest worth $158,634, and, to insure her ability to receive that interest, the husband's choice among the payment options was limited to Option II, Option III, or, under certain conditions, Option IV. Barred from selection by the husband were the maximum allowance option because of its minimal survivorship benefits and "Option I" because pension payments would cease if he outlived his life expectancy and no survivorship benefits would be available. He was also directed to designate the wife irrevocably as the beneficiary to the extent of her interest under whatever option he did choose. The judgment required that a copy of it be served on the pension plan administrators and enjoined them from accepting any election of a payment option or designation of a beneficiary which did not comply with the judgment.

After Special Term's decision but before the entry of judgment, the Fire Department Article 1-B Pension Fund of the City of New York (the fund) sought leave to intervene as a matter of right (CPLR 1012 [a] [2]), or, in the alternative, in the exercise of discretion (CPLR 1013), for the purpose of rearguing the pension distribution determination on constitutional and statutory grounds. The husband had not attacked the determinations on those grounds and even on appeal merely argues that the court abused its discretion and that Domestic Relations Law § 236 (B) does not authorize judicial limitation of pension options. In an order signed on the same day as the divorce judgment, Special Term denied the fund's applications and it has appealed from that order, arguing not only for intervention, but on the merits of the judgment as well.

▇ Special Term was correct in denying the fund leave to intervene as of right, since the standards of CPLR 1012 (a) (2) were not met. Nevertheless, it was error to refuse permission to intervene under CPLR 1013. The fund had a "real and substantial interest" in these proceedings (see, Plantech Hous. v Conlan, 74 AD2d 920, 921, appeal dismissed 51 NY2d 862; Matter of Petroleum Research Fund, 3 AD2d 1) and all it sought was reargument of the portion of the judgment applicable to it—a matter of law. The error is curable without a remittitur, however, since, by exercising our discretion to permit intervention on this appeal (see, Auerbach v Bennett, 47 NY2d 619), we now entertain the same argument that would have been made at Special Term.

▇ Before reaching the merits of that argument, we pause

to dispose of a number of lesser issues raised by the defendant. The plaintiff's testimony was sufficient to establish the unjustified and nonconsensual departure which constitutes abandonment *(see,* Domestic Relations Law § 170 [2]; *Schine v Schine,* 31 NY2d 113). Further, in a marriage of the duration of the instant one, it was not improper to divide the pension fund equally *(see, Antis v Antis,* 108 AD2d 889). The maintenance award was not excessive and the argument that it should not have been permitted to continue indefinitely is meritless because the payments were to terminate upon the defendant's retirement, a matter of three years. Since the court is empowered to require that one party provide medical insurance for the other (Domestic Relations Law § 236 [B] [8]), it was not an abuse of discretion for the trial court to require the defendant to maintain the existing coverage or its equivalent for the plaintiff's benefit, and, under the circumstances, we see no reason to insert a termination date for that obligation. Finally, the award of attorney's fees reflected no abuse of discretion *(see, Silver v Silver,* 63 AD2d 1017) but it did fail to credit the defendant with a payment of $500 made to the plaintiff's counsel pursuant to a pendente lite order, so the judgment must be modified in that respect. What requires extended discussion in this case is the propriety of the court's determination relative to pension options.

## II

Pensions represent a form of deferred compensation paid after retirement in lieu of the receipt of greater compensation during the period of employment *(Majauskas v Majauskas,* 61 NY2d 481, 491-492; *see also, D'Amato v D'Amato,* 96 AD2d 849). Deferral of that compensation obviously affects the spouse of the pension plan member, not only in the sense that it diminishes current income, but also because it slows the buildup of marital assets. An interest in the contractual right to a pension plan is marital property to the extent that the interest was acquired during the marriage and prior to commencement of a matrimonial action *(see, Majauskas v Majauskas, supra).* No one contests anymore that an equitable distribution court may recognize the interest of the nonmember spouse in the pension contract and award a portion of the contractual rights to that spouse by directing payment of portions of the pension benefits as they are made or by awarding cash or other property equivalent to the value of the interest in the contract *(see, Majauskas v Majauskas, supra,* at

p 493). Because the value of the McDermott pension exceeded the rest of the marital assets by far, Special Term awarded the wife an interest in the pension contract that permits her to share in the payments as made and in any further distribution after her husband's death. In our view, these determinations were a sound exercise of discretion and accordant with the court's power.

In *Damiano v Damiano* (94 AD2d 132, 139), and later in *Rodgers v Rodgers* (98 AD2d 386, 392, *appeal dismissed* 62 NY2d 646), we declared that while lump-sum distributive awards of the value of pensions *(see,* Domestic Relations Law § 236 [B] [5] [e]) are preferable because they permit immediate settlement of the distribution issues and avoid future enforcement problems, it is not improper to award a share of the benefits as they are received, especially where the remaining assets are not substantial enough to allow a current distributive award of all the assets. The method of distribution is discretionary and "must be contoured to suit the particular circumstances, needs and means of the parties in the case" *(Damiano v Damiano, supra,* at p 140). Inherent in the mandate of equitable distribution is the command that the property distribution be made by a means which is both fair and effective, calculated to protect the rights of the parties in the property and avoid wherever possible future litigation for the purpose of enforcement. If *Majauskas* did not specifically indorse all of the other reasoning in which we had indulged, it certainly agreed with our result *(see, Majauskas v Majauskas, supra,* at p 492, n 6).

Special Term's care in fashioning a solution to fit the circumstances and protect the wife's share of the pension is quite apparent. To prevent the husband from enhancing his current pension payments at the risk of forfeiting the reserve fund remaining at his death, selection of the maximum allowance option was prohibited. By rejecting Option I, the court obviated the possibility that the wife would receive nothing upon the husband's death. By limiting the amount of life insurance that could be purchased under Option IV and requiring that the wife be designated the beneficiary of the policy, the court ensured that current income would not be unduly constricted and that the wife would ultimately receive her share of the pension fund. Limiting the choice to Options II, III and IV provided current income to the wife, and requiring that she be named beneficiary of the pension to the extent of her interest under whatever option was selected

shielded her right to receive something akin to the value of her ownership interest in the pension.

## III

The fund's argument that Special Term lacked the power to make these directions is that the husband's right to select payment options is impenetrably shielded by provisions of the Administrative Code of the City of New York and the State Constitution. The code provision declares that pension benefits "shall not be subject to execution, garnishment, attachment, or any other process whatsoever, and shall be unassignable except as in this article specifically provided" (Administrative Code § B19-7.941). NY Constitution, article V, § 7 declares that membership in a public pension system creates "a contractual relationship, the benefits of which shall not be diminished or impaired".

Laws like the Administrative Code provision *(see,* Education Law § 524; Retirement and Social Security Law §§ 110, 410; Administrative Code §§ B18-52.0, B19-7.941) are not of recent vintage *(see,* L 1920, chs 503, 741). Their purpose is to protect public employee pensions against improvidence and misfortune that might permit creditors or assignees to upset the public policy considerations underlying the pension scheme *(see, Caravaggio v Retirement Bd. of Teachers' Retirement Sys.,* 36 NY2d 348, 353). While such laws did not prevent pensions from being reached for support of dependents *(see, e.g., Zwingmann v Zwingmann,* 150 App Div 358), prior to equitable distribution they did prevent enforcement of separation agreements that required designation of a spouse as irrevocable beneficiary of a public employee's pension *(Zwingmann v Zwingmann, supra)* or limited the right of the employee spouse to select among the various payment options provided by a public employee's pension plan *(Leavitt v Leavitt,* 54 AD2d 707). Relying on these preequitable distribution precedents—particularly *Caravaggio*—our dissenting colleagues would have us hold that there is no judicial power to direct designation of a beneficiary or limit the choice of pension payment options by a public employee. Such a holding would ignore the fundamental changes the equitable distribution statute has wrought in traditional common-law property concepts and the necessity to adjust judicial power to effectuate the new vision of marital property rights.

The 1980 Equitable Distribution Law (L 1980, ch 281) cre-

ated the concept of marital property, a property interest previously unknown in this State *(see, O'Brien v O'Brien,* 66 NY2d 576, 583). "Marital property" is the most crucial term in that statute (Scheinkman, 1964 Practice Commentary, McKinney's Cons Laws of NY, Domestic Relations Law C236B:4, 1986 Supp Pamph, p 203), for the power it gives the court is the centerpiece of the equitable distribution revolution the reformers sought *(see,* Foster and Freed, *Marital Property Reform in New York: Partnership of Co-Equals?,* 8 Fam LQ 169). No longer is the matrimonial court circumscribed in its adjustment of the economic incidents of the dissolution of a marriage by the technical trappings of ownership. Instead, it may disregard the form in which legal title has been held *(see,* Domestic Relations Law § 236 [B] [1] [c]) and distribute the marital property on the basis of listed equitable factors, something that could not have been done directly under prior law *(see, Szabo v Szabo,* 71 AD2d 32; *Taylor v Taylor,* 62 AD2d 944; *McGuigan v McGuigan,* 46 AD2d 665) and could not be done effectively by the employment of other traditional legal concepts such as constructive trusts *(see,* Foster and Freed, *Marital Property and the Chancellor's Foot,* 10 Fam LQ 55; Recent Developments, *Equitable Distribution in New York,* 45 Albany L Rev 483, 487, n 16). The "Legislature deliberately went beyond traditional property concepts when it formulated the Equitable Distribution Law" *(O'Brien v O'Brien,* 66 NY2d 576, 583, *supra)* and both *Majauskas* and *O'Brien (supra)* are unmistakable signals from the Court of Appeals that mindsets attuned to older doctrines must be abandoned if the judiciary is to recognize the sea change created by equitable distribution.

While the centerpiece of the equitable distribution revolution is indeed the concept of marital property and the judicial power to distribute it, what underlies everything doctrinally is the economic partnership that marriage constitutes in which the contribution of each spouse, in whatever form is recognized as furthering the partnership interest *(see, O'Brien v O'Brien,* 66 NY2d 576, 585, *supra;* Assembly mem, 1980 NY Legis Ann, at 130; Governor's mem approving L 1980, ch 281, 1980 McKinney's Session Laws of NY, at 1863). The economic partnership principle far exceeds in significance the merely rhetorical role it sometimes seems to assume. If marital property " 'arises full-grown, like Athena, upon the signing of a separation agreement or the commencement of a matrimonial action' " *(see, O'Brien v O'Brien, supra,* at p 583, quoting

Florescue, *"Market Value", Professional Licenses and Marital Property: A Dilemma in Search of a Horn,* Dec. 1982 NY St B Assn Fam L Rev 13), it does so because the economic partnership has nurtured it until the fateful moment of process service has permitted its revelation. While the legal effects of the partnership principle may not be visible to the naked eye until an action has begun, there can be little doubt that the principle affects much more than the psychology of the marital parties.

The McDermott pension grew and appreciated for the benefit of the economic partnership by virtue of the equitable distribution statute, a constitutional law *(see, Tucker v Tucker,* 80 AD2d 244, *mod on other grounds* 55 NY2d 378) that created property interests wholly unknown at common law. While the fund quite obviously views such a doctrine with abhorrence as it affects pensions, under the doctrine Mrs. McDermott began acquiring an interest in the pension from the moment her husband joined the plan. That interest, unenforceable and unallocated as it may have been prior to the divorce action, constituted the seed from which an inchoate interest in the pension emerged as a marital asset when the divorce action began *(see, United States v Davis,* 370 US 65) and matured into a true ownership interest when the equitable distribution judgment terminated the action. Behind the shield of the State Constitution and the Administrative Code was a pension contract whose ownership was being transformed—first potentially and then actually—through the workings of a constitutional statute that altered traditional property-right concepts.

During the marital property phase, when a spouse's interest is still inchoate, there can be no doubt that it is protectable against unwarranted dissipation, for the "power of restraint is vital to meaningful enforcement of the equitable distribution statute" *(Leibowits v Leibowits,* 93 AD2d 535, 537; *see also, Colin v Colin,* 113 AD2d 817; *Chachkes v Chachkes,* 107 AD2d 786; *Carella v Carella,* 106 AD2d 601). When inchoate rights become actual ownership interests by virtue of equitable distribution judgments, they are susceptible to even greater protection because their enhanced status eliminates some of the inhibitions inherent in the exercise of injunctive power prior to distribution. The court that awarded the wife a one-half ownership in the pension contract originally entered into between the husband and the fund possessed the power to

take appropriate measures to prevent the award from becoming an illusion.

The judicial power to protect the award of an interest in a pension contract by restricting the plan member's option choices does not implicate the "execution, garnishment, attachment, or any other process" proscribed by Administrative Code § B19-7.941 and the State legislation *(see,* Education Law § 524; Retirement and Social Security Law §§ 110, 410) in order to defeat creditors and assignees. As has already been noted, even in an earlier era, pension-protective laws like the Administrative Code provision did not prevent pension contracts from being reached by the courts to furnish support to dependents *(see, Zwingmann v Zwingmann,* 150 App Div 358, *supra; see also, Fox v Fox,* 276 App Div 859; *Monck v Monck,* 184 App Div 656). The classic statement of the rule concerning such laws when the pensioner's familial obligations are the issue is that "[t]he whole purpose of the statute is served when the fund is preserved for the use of the pensioner and those legally dependent upon him for support and maintenance; when it is held intact for the care of the woman who is, in law, but a part of himself and entitled, with him, to share in the pension" *(Zwingmann v Zwingmann, supra,* at p 360). This relatively ancient recognition of the wife's right to "share" in the husband's pension, although based upon a now-discarded concept of marital unity, has current application. These days the wife's right to "share" in the pension is effectuated as the grant of a property right, not alimony. The *Majauskas* court's broad reading of *Zwingmann* and *Monck* as applying generally to "the rights accorded [a spouse] upon dissolution of the marriage by a decree of divorce" *(Majauskas v Majauskas,* 61 NY2d 481, 493, *supra)* recognizes this fact. All these factors constitute and comprehend a broad and powerful public policy that inparts quite strongly to the judiciary the direction that must be taken. That direction cannot be pursued by reading restrictive terminology created to protect pensions against judicial process invoked by creditors and assignees as prohibiting the use of judicial power to protect an award of pension rights to a spouse.

Although this case may be the first that decides the issue directly, our colleagues in the Fourth Department certainly have indicated that pension awards can be protected against option selections that would render the awards illusory. In *Farsace v Farsace* (97 AD2d 951)—a case that preceded the *Majauskas* holding—the Fourth Department considered the

provisions of an equitable distribution decree which limited the husband's options with respect to his State employees' pension to those which would not impair the wife's rights to receive her share of the fund. Although the court fashioned another remedy by requiring the husband to carry insurance sufficient to satisfy the wife's claim, it specifically noted that it perceived "no authority that such provisions are not within the broad discretion accorded to the court" *(Farsace v Farsace, supra,* at p 952).

Our conclusion is apparent—nothing in laws intended to prevent the depletion of pension funds by creditors and assignees of pension plan members prevents the court that awards a portion of a pension contract to a spouse from taking further steps to help assure that the interest awarded will be received.

## IV

The fund argues further, however, that even apart from the Administrative Code provision, the Equitable Distribution Law cannot overcome the protection afforded to pension contracts by the provision of the State Constitution that declares the connection between a member of a pension plan and the pension system to be a "contractual relationship, the benefits of which shall not be diminished or impaired" (NY Const, art V, § 7). The section was introduced in the 1938 Constitution to overcome *Roddy v Valentine* (268 NY 228), which had held that a public employee's pension could be altered or even revoked by the Legislature prior to satisfaction of the requirements for retirement *(see, Public Employees Fed. v Cuomo,* 62 NY2d 450, 459; *Birnbaum v New York State Teachers Retirement Sys.,* 5 NY2d 1). The Constitutional Convention debate over the proposed provision centered upon the fiscal consequences to municipalities of transforming a legislative grant into a contractual relationship, especially since some retirement funds, notably those in New York City, were at the time actuarially unsound *(see,* Record of Proceedings of 1938 Constitutional Convention, at 1404-1423, 2548-2562, 2982-2993). In adopting the provision, the Convention obviously subordinated these fears to a policy of ensuring civil servants that the pension benefits they had been promised would be available when they retired.

Since its adoption, the constitutional provision has been applied primarily to prohibit the Legislature from altering the formula by which the amount of retirement benefits is deter-

mined. Held unconstitutional have been efforts to limit the increased compensation which is figured into the average salary of the final years of employment *(see, Kleinfeldt v New York City Employees' Retirement Sys.,* 36 NY2d 95); to eliminate the inclusion of cash payments for accumulated vacation credit in the final average salary *(Kranker v Levitt,* 30 NY2d 574); to adopt a mortality table which would have had the effect of reducing payments *(Birnbaum v New York State Teachers Retirement Sys.,* 5 NY2d 1, *supra);* to change the period used to compute final average salary *(Matter of McCaffrey v Board of Educ.,* 48 AD2d 853); and to eliminate vacation credit payments from the final average salary *(Matter of Weber v Levitt,* 41 AD2d 452). More recently, the provision has been held to affect other incidents of membership in the retirement system, such as the right upon discontinuance of service to withdraw funds contributed to the system *(Public Employees Fedn. v Cuomo,* 62 NY2d 450, *supra)* or the right to reenter the system upon renewed public employment *(Matter of Donner v New York City Employees' Retirement Sys.,* 33 NY2d 413). Nevertheless, the provision does not impair the right of the public employer to alter retirement benefits other than pension contracts *(see, Matter of Lippman v Board of Educ.,* 66 NY2d 313) or the incidents of employment itself by diminishing disability benefits *(see, Cook v City of Binghamton,* 48 NY2d 323) or salary *(Hoar v City of Yonkers,* 295 NY 274, *rearg denied* 295 NY 981); by changing the requirements for mandatory retirement *(Gorman v City of New York,* 280 App Div 39), or the management of the retirement system *(see, Brown v New York State Teachers Retirement Sys.,* 25 AD2d 344, *affd* 19 NY2d 779).

What the Constitution prevents, then, is reduction by the public employer of the financial benefits promised in the pension contract. But the *Majauskas* holding has made it clear that an equitable distribution court's award of an interest in a pension contract to a nonmember spouse does not unconstitutionally diminish or impair the plan member's pension or the contractual rights to it. Responding in *Majauskas* to the husband's contention that to "distribute his pension is to diminish or impair it contrary to the State Constitution (art V, § 7)", the court found that "the pension of the employee spouse is not diminished in the sense that the pension fund will pay any lesser amount" *(Majauskas v Majauskas,* 61 NY2d 481, 493, *supra).*

To the same effect, judicial restriction of option or benefi-

ciary choices does not diminish a pension in the sense that a lesser amount will be paid. The fund will continue to pay benefits in accordance with the terms of the contract, as it would have done had the judgment not intervened. The payment options are defined in the law which creates them as being actuarially equivalent (see, Administrative Code § B19-7.91; see also, Education Law § 513; Retirement and Social Security Law §§ 90, 390; Administrative Code § B18-49.0), so regardless of the option choice made and the difference in the amount of current payments reflected in that choice, the ultimate payment will be equivalent if the employee and beneficiary live out their normal life expectancies and no more.

In sum, Special Term has merely redirected payment of the pension benefits to fit the ownership pattern decreed by the court in conformity with the factors listed in the Equitable Distribution Law which is itself constitutional. It is from that vantage point that the legal issues on this appeal must be viewed. The contract that the fund perceives through vision imparted by traditional common-law precepts is a contract whose ownership became dual through enforcement of a constitutional law that in marital dissolution proceedings can compel the parties to share property rights on the basis of various factors listed in the law. The contract that may not be "diminished or impaired" (NY Const, art V, § 7) is now a co-owned contract; the declaration of co-ownership merely recognized the fact that Mr. and Mrs. McDermott were economic partners in the pension contract who, by virtue of their marital breakup, became co-owners. The limitation of the husband's choices merely protects the wife's co-ownership rights without reducing the benefits which will be paid pursuant to the contract. The judiciary may constitutionally and legally determine and decree that there are two owners of the pension contract and it has the discretion to constitutionally and legally adopt appropriate measures to protect the ownership interests of both.

Accordingly, the order denying the fund leave to intervene should be reversed, and the amount of counsel fees modified, but the provisions of the judgment of divorce dealing with the husband's pension should be affirmed.

THOMPSON, J. (concurring in part and dissenting in part). The principal issue presented on this appeal requires us to consider whether the trial court, in the exercise of the broad

discretion accorded to it by Domestic Relations Law § 236 (B), may limit the election by an employee spouse among alternate options available upon retirement under a public employment pension plan, and compel the employee spouse to designate irrevocably the nonemployee spouse as a beneficiary of pension benefits pursuant to the selected option. My colleagues in the majority concur in Special Term's ruling in this case of apparent first impression in this department, that a court has the power to direct the employee spouse's election of an option for the receipt of retirement benefits and the designation of a beneficiary "where necessary, to preserve the nonemployee spouse's interest in the fund" *(McDermott v McDermott,* 123 Misc 2d 355, 360). I believe that under the present posture of this State's decisional law, Special Term (123 Misc 2d 355) lacked the authority to limit the defendant's choice of pension options. It is in the determination of this issue that my views diverge from those of the majority and, accordingly, I vote to modify the judgment appealed from by deleting therefrom the provisions of Special Term's judgment directing the irrevocable designation of the plaintiff as beneficiary under the pension plan and limiting the defendant's choice of pension benefits.

An accurate rendition of the facts in this matter is set forth in particular detail in the opinion of the majority and, therefore, will not be repeated here. Suffice it to say that the marriage between the parties was of long duration, the major marital asset is the interest in a pension plan of the New York City Fire Department with whom the defendant was employed during most of the 33 years of the parties' marriage, and that the plaintiff is a housewife suffering from severe health problems and lacking in meaningful work experience such that her potential for developing any significant earnings in the future is virtually nonexistent.

At the outset, I note that the distinctions between intervention as of right under CPLR 1012 (a) and as a matter of discretion under CPLR 1013 are of little consequence *(see, Vantage Petroleum v Board of Assessment Review,* 91 AD2d 1037, 1040 [Lazer, J. P., dissenting], *affd* 61 NY2d 695; *Matter of Norstar Apts. v Town of Clay,* 112 AD2d 750). Hence, without indulging in the specifics of whether the Fire Department Article 1-B Pension Fund (hereinafter the fund) had a right, as a matter of law, to intervene, I join with the majority in their finding that Special Term abused its discretion as a matter of law by denying permissive leave to intervene.

It is well settled that pension benefits attributable to employment during the marriage and prior to commencement of a matrimonial action constitute marital property subject to equitable distribution upon divorce (see, Majauskas v Majauskas, 61 NY2d 481, 485-486; Rodgers v Rodgers, 98 AD2d 386, 392-393, appeal dismissed 62 NY2d 646; Damiano v Damiano, 94 AD2d 132, 139). In the face of this principle of law, the defendant in the instant matter does not challenge the plaintiff's entitlement to a portion of his pension. Rather, the defendant contests the share of his pension benefits awarded to the plaintiff and the provision of the judgment limiting the options he may select upon retirement and directing him to designate irrevocably the plaintiff as beneficiary of benefits payable upon his death.

I can see no reason to disturb the trial court's determination that the plaintiff is entitled to a one-half share of the benefits earned during the marriage and prior to commencement of the action. This was a marriage of long duration, and the entire pension accrued during the marriage. The plaintiff has virtually no employment potential in view of her long absence from the paid work force, her age and her health. Under these circumstances, the award of one half of defendant's pension benefits is clearly equitable.

I also am of the opinion that Special Term was correct in its assessment that an " 'if, as, and when' " approach rather than a lump-sum payment of benefits should be applied (see, Rodgers v Rodgers, 98 AD2d 386, 392, supra; Damiano v Damiano, 94 AD2d 132, 139, supra). The trial court properly concluded that a lump-sum distribution was not feasible because the husband's pension represented the primary marital asset and there were insufficient other marital assets from which such payment could be made. I further note that the defendant is not entitled to a lump-sum payment of his reserve fund.

I believe, however, that Special Term exceeded its authority in limiting the defendant's choice of options. While I am cognizant of the laudable goal which the trial court sought to accomplish by this provision, i.e., to prevent the defendant from defeating the plaintiff's rights to his pension benefits under the divorce judgment, the nature of the protection sought to be accorded the plaintiff's interest violates the public policy underlying public retirement systems. Therefore, I cannot join the majority's affirmance of Special Term's determination of this issue.

NY Constitution, article V, § 7 provides that, after July 1, 1940, "membership in any pension or retirement system of the state or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired". Thus, the defendant's membership in the fund was a "contractual relationship" *(see, Matter of Guzman v New York City Employees' Retirement Sys.,* 45 NY2d 186, 191; *Kleinfeldt v New York City Employees' Retirement Sys.,* 36 NY2d 95, 99). Part of the contract terms are contained in the provision of the Administrative Code of the City of New York § B19-7.94 governing the New York City Firemen's Retirement System. Administrative Code § B19-7.94 provides that the rights of a member of the fund to any pension benefits are exempt from "execution, garnishment, attachment, or any other process whatsoever, and shall be unassignable except as in this article specifically provided". I turn first to the fund's argument that Special Term's determination with respect to the limitation of options under the pension and the designation of beneficiary violates the antiassignment provision of the Administrative Code.

In *Caravaggio v Retirement Bd. of Teachers' Retirement Sys.* (36 NY2d 348), the Court of Appeals relied upon a similar exemption and antiassignment provision protecting the New York City Teachers' Retirement System (Administrative Code § B20-48.0) in reaching a determination that a pension member husband could not bargain away, by a provision in a separation agreement, his right to change his designation of beneficiary of benefits under the pension plan payable upon his death. The pension member husband had agreed in a separation agreement to designate irrevocably his first wife as his beneficiary of benefits payable under the New York City Teachers' Retirement System upon his death. Some time after the husband's divorce and remarriage, he filed a new designation of beneficiary naming his second wife as primary beneficiary. The court held that the husband had a statutory right to change his designation of beneficiary at any time. To find otherwise, the court opined, would defeat the public policy underlying the exemption and antiassignment provisions of many State and city retirement systems. The articulated intent is "to protect the member and his family from the results of his own improvidence or misfortune, and to relieve the retirement systems from the vast amount of administrative work attendant on the processing of attachments, assignments, and the like" *(Caravaggio v Retirement Bd. of Teach-*

*ers' Retirement Sys.,* 36 NY2d 348, 353, *supra).* Despite the court's refusal to give effect to that portion of the separation agreement limiting the husband's irrevocable designation of his first wife as beneficiary, it noted that such promise may form the basis of a contract action brought against the general assets of the husband's estate *(Caravaggio v Retirement Bd. of Teachers' Retirement Sys., supra,* at p 353).

In reliance upon the *Caravaggio* decision *(supra),* this court dismissed as violative of public policy a counterclaim interposed on behalf of a defendant wife for specific performance of a contract whereby the plaintiff husband agreed to irrevocably designate the plaintiff wife as beneficiary of the husband's benefits from the New York City Retirement Fund, and to elect an option upon retirement which would insure that she would receive at least one half of the periodic payments during her lifetime *(Leavitt v Leavitt,* 54 AD2d 707).

Parenthetically, I note, as does the majority, that the decisional law has created an exception to the exemption and alienation proscription of many public pension systems, holding such provisions to be inapplicable if they would serve to deprive the nonemployee spouse of the right to support *(see, e.g., Monck v Monck,* 184 App Div 656; *Zwingmann v Zwingmann,* 150 App Div 358). The Federal courts have similarly determined that the general antialienation provision of the Federal Employment Retirement Income Security Act of 1974 (ERISA) (29 USC § 1001 *et seq.)* does not bar garnishment of payable benefits in satisfaction of court-ordered family support payments *(see, e.g., Cody v Riecker,* 594 F2d 314; *American Tel. & Tel. Co. v Merry,* 592 F2d 118). The thrust of these decisions is that the family support obligation is entitled to special status. The purpose of the alienation and assignment proscription, namely, to preserve the pension fund for the benefit of the pensioner and his beneficiaries and to protect the pensioner from his own improvidence, would not be furthered by permitting the pensioner to avoid his traditional support obligations.

The instant case has developed primarily in the context of a property distribution and does not involve the enforcement of a predetermined support obligation. This distinction is not without its difficulty in regard to the equitable distribution of pension benefits. If the award of an interest in the benefits is characterized as support, the court apparently has the power to direct the election of options and designation of a beneficiary to the extent necessary to preserve the rights of the

nonemployee spouse in the fund *(see, Majauskas v Majauskas, 61 NY2d 481, 493, supra),* but if the award is denominated a property distribution the court's power is restricted by the antialienation provision *(see, Caravaggio v Retirement Bd. of Teachers' Retirement Sys., 36 NY2d 348, supra; Leavitt v Leavitt, 54 AD2d 707, supra).* The manner in which New York's equitable distribution statutes are structured demonstrates the close interrelationship and interdependency between a court's award of maintenance and division of marital property. Pursuant to Domestic Relations Law § 236 (B) (5) (d) (5), a court, in determining the equitable distribution of property, is directed to consider any award of maintenance. Conversely, in awarding maintenance, the court is directed to consider any distribution of marital property which has been made (Domestic Relations Law § 236 [B] [6] [a] [1]). In fact, Special Term, in ordering that maintenance be discontinued upon the defendant's retirement, was, in essence, substituting a portion of retirement benefits for maintenance. Thus, while the concepts are not interchangeable *(see, Rodgers v Rodgers, 98 AD2d 386, 393, supra; Perri v Perri, 97 AD2d 399, 400),* payments which in the strictest sense constitute support and those that represent a division of property clearly incident to a dissolution of marriage are economically so intertwined that a distinction between them for purposes of giving effect to the ban on assignment and alienation contained in the Administrative Code would seem to be unwarranted *(see, Matter of Spadaro v New York City Police Dept. Pension Serv.,* 115 Misc 2d 494). Such distinctions could conceivably deprive the nonemployee spouse of an equitable share in pension benefits to which such spouse is entitled by virtue of contributions to the marriage while concurrently depriving the nonemployee spouse of maintenance in reliance upon the expected distribution of pension benefits. The result would be particularly harsh in the instant matter because the plaintiff does not have the option of bringing an action against the defendant's estate to recover damages for breach of contract since no limitations upon the defendant's choice of pension benefits was incorporated into a separation agreement. The courts in both *Caravaggio v Retirement Bd. of Teachers' Retirement Sys.* and *Leavitt v Leavitt (supra),* expressly noted that a breach of contract action was available in order to recover damages for breach of terms which public policy precluded the courts from enforcing directly.

While I recognize that *Caravaggio* and *Leavitt (supra)* are

preequitable distribution decisions, I do not believe that the altered concepts of property interests which are the outgrowth of the Equitable Distribution Law have eliminated the proscriptions contained in the antiassignment provisions of many public employment retirement systems. Indeed, the Court of Appeals in *Majauskas v Majauskas* (61 NY2d 481, *supra)* declined to specifically overrule *Caravaggio.* Concededly, the court, in obiter dictum, seems to have opened the door for a partial retreat from the intractable position formulated in *Caravaggio.* However, Judge Meyer, writing for a unanimous Bench, distinguished *Caravaggio,* thereby leaving its precedential value intact. The court reasoned as follows: "There remains for consideration the husband's contention that to distribute his pension is to diminish or impair it contrary to the State Constitution (art V, § 7). The short answer is that the pension of the employee spouse is not diminished in the sense that the pension fund will pay any lesser amount. The husband's reliance upon *Caravaggio v Retirement Bd.* (36 NY2d 348) is misplaced, for that decision depended not upon the Constitution but upon an antiassignment statute, and held that the pensioner could not contract away, by a provision in a separation agreement purporting to make his then wife the irrevocable beneficiary of all benefits payable upon his death after retirement, his right under the plan to designate his second wife as such beneficiary. Although section 410 of the Retirement and Social Security Law contains similar protection of police pensions against assignment or legal process, such provisions have been consistently construed not to have the effect of depriving the nonemployee spouse of the rights accorded him or her upon dissolution of the marriage by a decree of divorce *(Monck v Monck,* 184 App Div 656; *Zwingmann v Zwingmann,* 150 App Div 358; *Matter of Spadaro v New York City Police Dept. Pension Serv.,* 115 Misc 2d 494; *see American Tel. & Tel. Co. v Merry,* 592 F2d 118)" *(Majauskas v Majauskas, supra,* at p 493).

The above-quoted language of the *Majauskas* court is ambiguous, at best, and may not be read so broadly as to extend the limited exception to public pension antiassignment clauses to encompass any rights of the nonemployee spouse following dissolution of a marriage.*

---

* In *Sochor v International Business Machs. Corp.* (60 NY2d 254), the Court of Appeals raised the question of whether the courts can compel an election among alternative pension benefit options but left the question

The only apposite New York cases on this question, both of which were decided by the Appellate Division, Fourth Department, provide little assistance in resolving the instant matter. In *Farsace v Farsace* (97 AD2d 951), which Special Term ignored in its decision, the trial court limited the defendant husband's choice of options under the New York State Employees' Retirement System, of which he was a member, to those which would not impair the plaintiff wife's rights to receive the full amount of her equitable share. To protect against the contingency of the husband's death before retirement, the court directed the husband to keep in effect until his retirement a contractual will giving the wife a right to claim from his estate an amount equal to her equitable share in the pension plan. Making no reference to *Caravaggio (supra)*, the Fourth Department ruled that the provisions of the trial court's order were within the broad discretion of the court. Nevertheless, the court modified the order to provide, alternatively, that the husband could elect any available pension option as long as he maintained in effect an insurance policy naming the wife as irrevocable beneficiary in an amount sufficient to pay the remaining balance of the wife's equitable share of the pension.

While the approach of the *Farsace* court is tempting, I do not believe that it is feasible in the matter before us to follow the lead of the *Farsace* court and require the defendant to purchase life insurance for plaintiff's benefit to protect her equitable share in the pension. In view of the defendant's age, the insurance alternative would be unduly burdensome by substantially diminishing the defendant's available income. If the defendant were to purchase insurance under Option IV of the fund at a cost of approximately $65 per $1,000 of coverage he would have to pay approximately $10,000 in premiums the first year in order to obtain coverage sufficient to protect the plaintiff's equitable share in the pension. Moreover, in order to avoid the financial consequences of the insurance alternatives, the defendant would essentially be economically coerced

---

unresolved. The court held that where the former spouse is not a party to the action, an election could not be forced upon him. It specifically stated that "[w]e have no occasion to consider what remedies, if any, the wife might have if her former husband were a party to this proceeding" *(Sochor v International Business Machs. Corp., supra,* at p 257, n 1). In this regard, Special Term, in deciding the instant matter, was without power to direct the fund at bar to ensure that the defendant's election of an option coincided with its decision as the fund was not a party to the proceeding *(cf. Wilson v Wilson,* 101 AD2d 536, 542).

into choosing an option which would preserve the plaintiff's interest in the pension fund. It thus becomes clear that such a directive would accomplish indirectly what we are powerless to do directly, namely, to limit the defendant's selection of options under the pension plan.

In a case decided after the decision of Special Term in the instant matter, the Fourth Department reaffirmed the holding of *Farsace (supra)*. However, rather than expressly limiting the defendant's choice of options under his pension plan, the court stated that the plaintiff's equitable share of each periodic payment was to be computed as though the defendant had chosen the maximum allowance under the pension *(Ferriera v Ferriera,* 112 AD2d 22).

I cannot adopt the reasoning of the *Farsace* and *Ferriera* courts because I disagree with the basic premise of those decisions, namely, that the power to direct the choice of options and designation of beneficiary under a public employment pension plan is encompassed within the broad discretion of the trial courts. Although the decision in *Majauskas (supra)* seems to have expanded the exception to the general proscription against alienation and assignment of pension benefits under public retirement systems, it did not overrule *Caravaggio* (36 NY2d 348, *supra)*. Until the Court of Appeals expressly does so, we are bound by stare decisis to find that the exception is inapplicable to an equitable distribution of marital property. I cannot accept the arguments asserted by my colleagues in the majority that the property concepts developed by the Equitable Distribution Law override the traditional protections afforded pension benefits. The majority's well-reasoned analysis presents compelling arguments for pursuing measures to ensure that a nonemployee spouse's interest in the employee spouse's pension is protected. Nonetheless, I fail to perceive the nature of our authority to ignore established precedent. The Court of Appeals in *Majauskas (supra)* had the opportunity to address the scope of judicial authority in this regard, albeit in dicta; its silence may not be construed as an implicit derogation of the protections against judicial process traditionally awarded certain public employment pensions.

In recognition of the limits of the court's authority, I believe the best approach at bar to ensure that the plaintiff derives the maximum benefits possible in satisfaction of her equitable share of the pension is to compute the equitable share of each periodic payment as though the defendant had chosen the

maximum allowance under his pension *(cf. Ferriera v Ferriera, supra)*. Significantly, in this regard, the supervisor of the fund, Paul J. Porcello, testified at the trial that during the period of his tenure as supervisor, all but five of 1,300 retirees had chosen the maximum allowance benefit. Each of the retirees, who had chosen an option other than the maximum allowance, was suffering from a terminal illness and had been advised that he did not have long to live. There is nothing in the record to indicate that the defendant suffers from any significant health problems. Therefore, we may safely assume that had he not been divorced from the plaintiff he would have followed the lead of the majority of retirees and chosen the maximum allowance benefit. I indulge in this hypothesis for the purpose of demonstrating that adopting the approach which I suggest will simply lend the imprimatur of legal mandate to conduct which would have been undertaken notwithstanding any judicial direction.

As a final note, I share the majority's rejection of the fund's argument that judicial restriction of pension option and beneficiary choices is violative of the State Constitution's nonimpairment of contracts clause (NY Const, art V, § 7). The *Majauskas* court found that distribution of pension benefits did not diminish or impair the pension contrary to the State Constitution, reasoning that "the pension of the employee spouse is not diminished in the sense that the pension fund will pay any lesser amount" *(Majauskas v Majauskas,* 61 NY2d 481, 493, *supra)*. The same principle is applicable to the matter before us.

In sum, I dissent and vote to reverse so much of the judgment appealed from as limited the defendant's choice of options and designation of a beneficiary under the fund. I concur as to the modification of the counsel fees provision of the judgment in order to give the defendant credit for counsel fees previously paid, as to affirmance of the remaining provisions of the judgment, and as to the reversal of the order denying permissive intervention.

NIEHOFF and RUBIN, JJ., concur with LAZER, J. P.; THOMPSON, J., dissents in part and votes to delete the provisions of the judgment appealed from which limit the defendant's choice of options and designation of beneficiary with respect to his pension, and otherwise concurs and votes to further modify the judgment by reducing the award of counsel fees from $7,500 to $7,000, to otherwise affirm the judgment, and to reverse the order appealed from and to grant the proposed

intervenor's motion for leave to intervene, with an opinion, in which WEINSTEIN, J., concurs.

Ordered that the order of the Supreme Court, Richmond County, dated April 16, 1984, is reversed, an the proposed intervenor's application for leave to intervene is granted, and it is further

Ordered that the judgment of the same court, dated April 16, 1984, is modified, on the facts, by reducing the award of counsel fees from $7,500 to $7,000. As so modified, the judgment is affirmed, and it is further

Ordered that the plaintiff is awarded one bill of costs.