OPINION OF THE COURT
Robert Roberto, Jr., J.
The parties appeared before this court for trial on the issue of the equitable distribution of their marital property having been divorced as a result of this court’s granting reverse summary judgment in favor of the defendant. The aforesaid order was decided prior to the Legislature’s precluding the granting of reverse summary judgment in matrimonial actions; therefore, only the equitable distribution of the parties’ marital property was at issue.
The primary issue before this court centers on the valuation of the defendant’s business, and inextricably entwined in such *969 determination is the question of plaintiffs interest in defendant’s business.
Before discussing the aforesaid issue, the court believes a brief chronology of the parties’ marriage and eventual separation, along with the history of defendant’s business, is required.
The parties were married on June 20, 1943 in Kings County in the State of New York. At the time of their marriage the plaintiff and defendant were approximately 22 and 23 years old, respectively. It was the first marriage for both parties. After their marriage the parties resided and worked in Washington, D.C. Mrs. Wegman was employed as a social worker and Mr. Wegman worked for the Federal Government. Both parties possess undergraduate and advanced college degrees. The plaintiff has a B.A. degree from NYU and a M.A. degree from Smith College. The defendant possesses a Master’s degree from Harvard University in public administration.
In the summer of 1947 the parties elected to return to New York since the defendant’s job with the Federal Government was being phased out. In addition, during the latter part of 1946 the defendant’s uncle, Samuel J. Wegman, died intestate leaving as distributees the defendant, the defendant’s three brothers and three female cousins. Part of this estate included the S.J. Wegman Company (S.J.W.) which was essentially a mail order business selling women’s foundation undergarments, and a dipilatory product.
The parties moved in with plaintiffs parents and plaintiff began working for the Jewish Family Services as a social worker earning approximately $4,000 per year. The defendant became involved in the operation of the S.J.W.
During the latter part of 1947 the defendant and his three brothers purchased the 3/i interest of their three cousins in S.J.W. for the sum of $7,200 with each brother contributing $1,800. The defendant, in light of his financial condition, was given the $1,800 by his brother Leonard to enable him to participate in the acquisition. The defendant now had a 25% interest in S.J.W. and devoted his working hours to the operation and expansion of S.J.W. The operation and expansion of S.J.W. will be addressed by the court in due course.
The domestic lives of the parties continued to evolve and in 1949 the plaintiff ceased working and gave birth to the parties’ first son. Shortly before the birth of their son the parties moved into their own apartment.
*970 In 1958 the parties’ second son was born and the parties purchased a house in Freeport (where plaintiff continues to reside). The purchase price was $41,000 and the $15,000 down payment used to buy the house was derived from a $25,000 personal injury settlement which the parties received as a result of an automobile accident that the parties were involved in during 1947. The plaintiff had been injured in the accident and testified to having been hospitalized for seven weeks as a result of the accident.
From 1949 until 1957 the plaintiff was not employed but was a homemaker and testified that she engaged in the typical activities which are associated with such title. The parties did also employ a live-in maid to assist plaintiff. In 1957 the plaintiff took a part-time job requiring her to work one day a week. This part-time position lasted until 1966 when she was employed full time at Queens Hospital. The defendant testified that the parties’ marital difficulties began during the early 1960’s and centered around the plaintiff’s desire to resume her career as a social worker and also plaintiff’s lack of desire to engage in sex.
In 1967 the plaintiff testified that she experienced a period of depression relating in part to certain physical ailments, and it was about this time that the defendant alleges the parties ceased sleeping in the same bedroom.
The parties continued, however, to reside together in the house in Freeport and, in fact, went on vacations with their children to Europe in 1966, 1969 and 1971. In September 1972, however, the parties’ youngest son left for college and it was at this time that the defendant left the marital home and took up residence in a basement apartment in Rockville Centre.
The defendant continued to pay for the maintenance of the Freeport house and also for the educational and living expenses of the parties’ two children.
In July of 1973, after attempts at settlement proved unsuccessful, Mr. Wegman commenced an action for divorce and Mrs. Wegman counterclaimed for the imposition of a constructive trust with respect to the marital residence and Mr. Wegman’s business.
Almost four years later, in 1977, the action was tried before a jury which found in favor of Mrs. Wegman and dismissed Mr. Wegman’s action for divorce. The trial court at that time made an award of support to Mrs. Wegman and directed an *971 immediate sale of the house in Freeport. The husband paid his support obligations but did not compel the sale of the house, allowing plaintiff to continue to reside in the Freeport residence. Mrs. Wegman continued to refuse to grant her husband a divorce.
In July of 1981 the plaintiff served a summons commencing the present action.
As previously stated, the defendant, after relocating to New York, was totally committed to the operation of S.J.W.; and in 1951 Honor House Products Corporation (Honor House) was formed to handle a portion of the mail order business and to permit S.J.W. to operate as a corporate entity. All the shares of stock in Honor House were owned by S.J.W.
In or about 1953 S.J.W. moved its business location from the City of New York to 35 Wilbur Street, Lynbrook, New York. This property was and is owned by the Wilbur Street Corporation (a corporation wholly owned by S.J.W.) which leases the building to S.J.W.
The change in the location of the business foreshadowed a change in the nature of the products which S.J.W. would begin to develop. Sometime in 1956 the company expanded into the area of chemicals and biological materials. The financing of the expansion was derived primarily from the original mail order business which S.J.W. continued to engage in.
In 1957 Agricultural Biologies Corporation (ABC) was formed to develop and market a product known as gibberellic acid, which was alleged to stimulate plant growth. ABC was a subsidiary of S.J.W., all of whose stock was originally owned by S.J.W. The marketing of this product subsequently proved to be unprofitable.
The parties testified that sometime in 1957 or 1958 ABC became involved with the research and development of a drug product known as collagenase, an enzyme with certain properties useful for medical purposes.
In addition to the funding received by the profits of S.J.W.’s mail order business, which operated through the corporate entity Honor House, sometime in the early 1960’s S.J.W. sold approximately 30% of the stock in ABC to various investors including the plaintiff’s father. ABC, also during the early 1960’s, changed its name from Agricultural Biologies Corporation to Advance Biofactures Corporation (ABC).
In 1960 ABC entered into a contract with Johnson & *972 Johnson for the sale of collagenase for the purpose of research and in 1965 the FDA gave approval for the sale of collagenase to the public. Upon granting approval, ABC entered into a marketing contract with E.R. Squibb & Sons. ABC also sold collagenase to Knoll A.G., a European company, for resale of the drug in Germany.
Approximately one year later E.R. Squibb & Sons terminated the aforesaid contract due to alleged problems with collagenase and the product was taken off the market for additional clinical testing.
In February of 1969 the defendant and his three brothers entered into a partnership agreement regarding S.J.W., which essentially provided that the defendant would be a general partner with an 85% interest in S.J.W. and that his three brothers would be limited partners, each with a 5% interest. The court notes that defendant’s brothers were highly successful in their own careers and essentially allowed the defendant to operate S.J.W., Honor House and ABC.
The defendant testified that ABC attempted to obtain additional capital for its research into new products by a public stock offering sometime in 1970, but that the project was abandoned prior to obtaining S.E.C. approval.
A second attempt was made by ABC at the end of 1972 to go public, but once again the project was abandoned prior to S.E.C. approval. A preliminary prospectus was prepared in connection with proposed offering.
ABC did succeed in 1972 in again obtaining FDA approval for the sale of collagenase and did enter into a distribution agreement in July of 1972 with Knoll P.C., the American subsidiary of Knoll A.G.
Another agreement, this time with Knoll A.G., was entered into in 1975 for the sale of collagenase worldwide.
During the mid- to late-1970’s ABC formed several corporate subsidiaries on the island of Curacao for the manufacture of collagenase on that island. This was allegedly done to enable Knoll A.G. to purchase the product without the imposition of customs’ duties and without further difficulties which the Federal Drug Administration might provide and to deal with the European common market. All of the shares of stock in the Curacao corporations are owned by ABC.
In 1974 one of the defendant’s brothers died leaving his interest in S.J.W., Honor House and ABC to his wife. Approxi *973 mately one and a half years later the wife died, leaving the business interests to defendant and his two surviving brothers.
The limited partnership agreement was amended in September of 1978 to reflect the death of one of the defendant’s brothers. This amendment provided that the first $4,000 in profits and losses would be divided three ways and that any additional profits and losses would be divided by the defendant receiving 85% and the two surviving brothers each receiving 71/2%.
In 1983 the tangible assets of Honor House were sold to Romar Sales Corp. It would appear that the purchase price was minimal and was applied to Honor House’s liabilities which existed at the time of the sale. It was apparent from the testimony of the parties that by 1974-1975 the primary source of revenue was now derived from ABC and the mail order business conducted by Honor House had become secondary.
As was stated at the outset, it is the valuation of defendant’s business and plaintiffs interest therein under the Equitable Distribution Law which is the primary issue and which this court will now discuss.
It is quite clear that defendant’s initial interest in S.J.W. accrued to him by virtue of an inheritance from his uncle and a gift from his brother and is therefore "separate property” as defined by Domestic Relations Law § 236 (B) (1) (d) (1). Without such bequest and gift the defendant would never had become involved with S.J.W. and, consequently, Honor House or ABC.
The plaintiff argues that any semblence between the S.J.W. that defendant’s uncle ran and the S.J.W. which evolved under the guidance of defendant exists only as to the name of the company. The business was expanded and changed after defendant took control and this change occurred during the marriage. Plaintiff relies heavily upon the case of Roffman v Roffman (124 Misc 2d 636) to support her argument that defendant’s interest in S.J.W., Honor House and ABC is marital property and that plaintiff is therefore entitled to more than the appreciation in the value of this property during the marriage.
This court does not elect to follow the reasoning of the Roffman case to the extent argued by plaintiff. The language of Domestic Relations Law § 236 (B) (1) (d) (1) is quite clear and the facts adduced at trial support a finding that defen *974 dant’s interest in S.J.W. was obtained by bequest and gift. Having made such a determination the court finds that plaintiff would only be entitled to a percentage interest in the appreciation in value of such separate property during the marriage which can be attributed to her contributions. (Conner v Conner, 97 AD2d 88; Nolan v Nolan, 107 AD2d 190; Wood v Wood, 119 Misc 2d 1076.)
The plaintiff testified that in addition to her contributions as a homemaker, mother and wage earner, she also helped entertain business associates, introduced defendant to individuals (including her father) who invested in the defendant’s growing business and also introduced the defendant to her cousin, Harold Stern, who was eventually employed by the defendant in connection with the development of agricultural chemicals. It is these direct and indirect contributions which shall determine plaintiff’s interest in the appreciation of defendant’s business. The facts and circumstances in this case warrant a finding that plaintiff’s role as spouse, parent, wage earner and homemaker contributed to the appreciation of the defendant’s business notwithstanding the language contained in the lower court’s decision in Jolis v Jolis (111 Misc 2d 965, affd 98 AD2d 692), which did not consider the aforesaid contributions towards the appreciation of separate property.
The appellate court in affirming the lower court’s decision in Jolis (supra) did not preclude the consideration of such contributions and services, but did not feel they were applicable in that particular case. This court finds such services and contributions should be applicable in this case.
While it is true that the parties lived together as husband and wife for 29 years before separating in September of 1972, it is also true that they have not lived together for the past 14 years. Quite obviously, plaintiff did nothing to contribute to the appreciation of the defendant’s business after the separation, and at trial no testimony was given regarding any contributions for that period.
Plaintiff argued that the defendant’s interest in S.J.W., Honor House and ABC is marital property and, having taken the aforesaid position, logically concluded that these items should be valued as of the date of trial. Given the fact that the court has determined that defendant’s interest in these companies is separate property, the appreciation of which plaintiff is entitled to a percentage of, utilizing the trial date for valuation purposes would be inappropriate. The date of *975 separation shall be controlling vis-á-vis the valuation of defendant’s business interests.
The court, at trial, received testimony from both plaintiffs experts and defendant’s expert regarding the valuation of defendant’s business interests. Each of the parties’ experts valued the business utilizing various methods and also valued the business at different times. This court is concerned, however, only with the valuation at the time of the parties’ separation in September of 1972.
As previously stated, there was an attempt in 1972 to offer to the public shares of ABC common stock and, in connection therewith, a prospectus was prepared and was placed into evidence by plaintiff and is marked as plaintiff’s exhibit 22. This prospectus was utilized by plaintiffs experts in determining a value for ABC as of December 29, 1972, the date of the prospectus and the approximate date of the parties’ separation.
The prospectus described the principal holders of securities as of September 30, 1972 and reflects that 399,780 shares of stock were outstanding and that S.J.W. owned 286,388 of said shares. Defendant owned 1,811 shares individually.
The plaintiffs experts, utilizing both Revenue Ruling No. 59-60 and the prospectus which had established $8 as the price per share for the public offering, valued ABC at $4,487,-808 and determined that defendant’s interest would total $2,500,000. Plaintiffs expert also valued Honor House, as of 1973, at $577,500 with defendant’s 85% interest equaling $490,000.
Defendant’s expert, who was the accountant for S.J.W., Honor House and ABC, valued all the business entities (S.J.W., Wilbur Street, Honor House, ABC) as of 1973 based upon a multiple of the companies’ earnings, together with the liquidation of the assets, less a deduction for Federal and State income tax. Utilizing this method for valuing closely held corporations, defendant’s expert testified that the total value of the aforesaid business entities as of January 31, 1973 was $333,128.
Clearly, there is a tremendous discrepancy between the valuation of plaintiff’s experts and that of defendant’s expert and the court believes that such divergence of expert opinions supports this court’s belief in the appointment, by the court, of an independent expert whose report woúld be utilized by the court in fixing valuations.
*976 Not having the benefit of such an independent valuation, the court shall fix its own valuation based upon the testimony and the proposed prospectus of ABC. The court shall rely heavily upon said prospectus.
The court takes judicial notice that a stock prospectus merely presents an offer to sell and that there is no guarantee that the public will agree to purchase stock at the offering price. This is especially true in the instant case where the offering was never made public.
A transaction involving ABC stock did take place approximately the same time the parties separated and this court shall rely heavily on this transaction in determining ABC’s value.
On December 20, 1972, ABC satisfied a $177,779 indebtedness to S.J.W. by tendering 35,556 shares of ABC to S.J.W., the value of each share equaling $5.
The court finds that the aforesaid transaction established what the officers of ABC believed a share of stock in the corporation was worth and the court finds, in light of the conflicting testimony of the parties’ experts, that ABC should be valued as of September 1972 by multiplying the outstanding shares of common stock (399,780) by $5. Using such formula the court values ABC at $1,998,900. The court finds that defendant’s interest in ABC, at the time of the separation, equaled $1,226,204. This is derived by taking 85% of the 286,388 shares owned by S.J.W., adding to that the 1,811 shares owned by defendant outright, and multiplying that by $5.
The experts again offered widely divergent valuations for Honor House. Plaintiff’s experts valued it at $577,500 and defendant’s expert valued it at $170,000 based upon a formula which took the year’s profits and multiplied them by 5.
This court finds that given only the testimony of the parties’ experts, the testimony of plaintiff’s experts is more persuasive; therefore, the court values Honor House as of the date of separation at $577,500 and defendant’s 85% interest would total $490,875.
The commercial property in Lynbrook owned by the Wilbur Street Corporation is the last of the so-called business property to be valued. The plaintiff’s experts did not value the property as of the date of separation, but only as of the date the action was commenced and the trial date. Defendant’s expert did value the property as of the date of separation and *977 fixed a value as of that date of $203,833. There was testimony that there was an outstanding mortgage of $56,500 on the property as of the date of separation. Since the court has no other testimony other than defendant’s expert for a separation date valuation, the court shall accept the testimony of defendant’s expert and values the Wilbur Street property at $203,-833. Deducting the then outstanding mortgage of $56,500 the net value equals $147,333 of which defendant had an 85% interest or $125,233.
The total valuation, then, of defendant’s business interests as of the date the parties separated equals $1,842,312. The appreciation of the value of this property equals $1,825,512. The court derived the aforesaid figure by fixing a $16,800 value for S.J.W. as of 1947 when defendant’s brothers purchased the 3A interest of their cousins for $7,200. Deducting the $16,800 from $1,842,312 determines the appreciation in value of the business.
The court must now fix plaintiffs interest in the appreciation of defendant’s business interest.
As previously stated, the court believes the facts of this case warrant that in addition to her direct contributions, the indirect contributions of plaintiff as a "spouse, parent, wage earner and homemaker, and to the career” of defendant should be considered in determining plaintiff’s interest in the appreciation of the defendant’s business. It should be noted that for approximately 15 years prior to their separation, plaintiff was employed and was active in her own career.
Based upon all of the testimony and physical evidence from the trial, this court believes that plaintiff’s equitable share of the appreciation of the defendant’s business interest equals 45%. This amounts to the sum of $821,480.
The court shall next consider the parties’ marital residence in Freeport where the plaintiff, notwithstanding the judgment in the prior matrimonial action which directed that the Free-port house be sold, has continued to live. The defendant testified that he has continued to pay the monthly carrying charges pursuant to the aforesaid judgment.
For the purposes of valuing this house, which is marital property, the court shall use a valuation as of the date of trial, since the facts of this case warrant a trial date valuation for this particular marital asset.
The plaintiffs expert testified that the Freeport house was valued at $147,000 as of December 1984. The trial date valúa *978 tion of defendant’s expert for the Freeport house was $174,-000. The court believes that notwithstanding the holding in Gainer v Gainer (111 AD2d 308), the average of the two appraisals for this residential property would be appropriate and therefore fixes the trial date valuation of the Freeport house at $160,500 and based upon the prior judgment of Justice Pantano, each party is entitled to one half of this amount.
The defendant sometime in 1974 purchased his present residence in Hewlett. The purchase occurred subsequent to the separation of the parties and the institution of the prior matrimonial action. Since its purchase for $115,000 in 1974 (a mortgage of $100,000 was obtained by defendant), this house has appreciated in value.
It is defendant’s position that this property is not marital property while plaintiff argues that it is.
The defendant’s argument is based upon the definition of "marital property” contained in Domestic Relations Law § 236 (B) (1) (c) which states: "The term 'marital property’ shall mean all property acquired by either or both spouses during the marriage and before the execution of a separation agreement or the commencement of a matrimonial action”.
It is quite clear that defendant commenced "a matrimonial action” in 1973 wherein he sought to divorce his wife. The action ended in 1977 with a jury verdict in favor of Mrs. Wegman. Although defendant was unsuccessful in obtaining a divorce in that extensively litigated action, the defendant continued to make the support payments ordered by the court and defendant argues that the term "matrimonial action” as used in Domestic Relations Law § 236 to terminate marital property need not culminate in a judgment for divorce. Nor does the statute state that the "matrimonial action” must be the one wherein the court is determining the equitable distribution of the assets.
This issue appears to be one of first impression in this jurisdiction and plaintiff has offered in support of her position certain cases from New Jersey, which has had an Equitable Distribution Law for some time.
The New Jersey Divorce Reform Act of 1971 amended that State’s matrimonial law to provide for the equitable distribution of marital assets and states: "In all actions where a judgment of divorce or divorce from bed and board is entered the court may make such award or awards to the parties, in *979 addition to alimony and maintenance, to effectuate an equitable distribution of the property, both real and personal, which was legally and beneficially acquired by them or either of them during the marriage. ” (NJ Stats Ann § 2A:34-23; emphasis added.)
The landmark case in New Jersey upon which plaintiff heavily relies and which first sought to interpret the phrase "during the marriage” was Painter v Painter (65 NJ 196, 320 A2d 484). In that case the Supreme Court of New Jersey considered three possible constructions. The first was the actual date which a judgment of divorce is granted and this was rejected as impractical since such an interpretation would result in a bifurcation of the trial.
The second construction would exclude from equitable distribution all assets "acquired after it could be shown that there was an irretrievable breakdown of the marriage or after a cause of action for divorce had arisen.” (Painter v Painter, 65 NJ, at p 217, 320 A2d, at p 495.) This was also rejected upon the ground that a court would not be able "to establish with any reasonable precision when a breakdown of the marital relationship has become irretrievable” (supra, p 217, p 495).
The court finally settled upon the day the complaint is filed as the proper terminal date for determining what marital property would be.
The New Jersey courts have, however, demonstrated their flexibility in relying upon dates other than the filing of the complaint where the "irretrievable breakdown” could be readily determined. (Di Giacomo v Di Giacomo, 80 NJ 155, 402 A2d 922.) The recognition of exceptions to the rule established in the Painter case was reaffirmed in Portner v Portner (93 NJ 215, 460 A2d 115).
In the present case, in addition to the physical separation of the parties, we have the husband actually commencing an action for divorce based upon cruel and inhuman treatment and abandonment.
The action for divorce was denied; however, the judgment of the Honorable B. Thomas Pantano which was entered on April 18, 1977, directed the sale of the marital residence with the net proceeds to be equally divided. In addition, the court awarded alimony to Mrs. Wegman and directed that Mr. Wegman continue to pay the carrying charges on the Freeport house until its sale.
The parties have never cohabited since their separation in *980 1972 and, in fact, the defendant obtained a so-called "Haitian Divorce” in August of 1977, and although said divorce is not recognized by this State, Mr. Wegman "married” an individual in August of 1977 with whom he has since resided with at the house in Hewlett.
Under all these circumstances this court believes that the marriage of the parties was irretrievably broken when the matrimonial action was commenced in 1973 and therefore the Hewlett house shall not be considered marital property for equitable distribution purposes. To hold otherwise, under all of the circumstances present, would result in an inequitable distribution.
The last assets alleged to be marital property are the respective parties’ pensions, profit-sharing plan, annuity and stock portfolio. The testimony adduced at trial establishes that plaintiffs pension and annuity are valued, at the time of trial, at approximately $128,241 and that the defendant’s profit-sharing plan and securities portfolio is valued at trial at $97,732. The court believes that each party should retain their entire interest in these assets in light of the values. Such an allocation achieves an equitable disposition of these marital assets.
The court, in making the aforesaid determination regarding the pension, annuity, profit-sharing plan and stock portfolio, considered the factors contained in Domestic Relations Law § 236 (B) (5) (d) including the income of and property of each party, both at the time of marriage and at the commencement of the action.
The marriage was one of long duration and both parties appear to be in good health.
The third factor was not applicable to the court’s determination; however, the loss of inheritance and respective pension rights was considered and since each party had almost similar pension rights, the court felt each should retain full interest in their own pension. There was similar offset as between plaintiff’s annuity and defendant’s stock portfolio.
Since plaintiff is employed and earning a substantial income, maintenance was not awarded and the lack of maintenance was not crucial to the court’s decision regarding the pension, etc. Nor were factors 9 and 10. Regarding the remaining three factors, the court considered the contributions of each party, the character of the marital property to be distributed, and the parties’ probable future circumstances in arriving at the disposition of the marital property.
*981 As previously stated, the court denied plaintiffs request for maintenance in light of her employment for almost 28 years and the substantial income which she derives from said employment. Clearly, the plaintiff has had almost no expenses for housing, as defendant continued to pay the carrying charges on the Freeport house, and as a result of this decision she shall derive a substantial distributive award.
The last issue to be disposed of is plaintiffs request for counsel fees. The plaintiff, while not in the same income level as the defendant, is nonetheless financially well off; especially in light of this court’s impending distributive award. Under these circumstances, the court believes an award to plaintiff of $15,000 in counsel fees to be equitable. Such award is in no way indicative of what plaintiff’s total counsel fee shall be, but only reflects the portion which defendant shall be responsible for. The $15,000 is to be paid within 60 days after entry of the judgment.
As to plaintiffs request for accountant’s fees, the court denies said request since an interim accountant’s fee of $10,-000 has been paid and the plaintiffs financial position does not warrant any further award.
Accordingly, the court finds that a distributive award is appropriate (McDicken v McDicken, 109 AD2d 734), and such award shall equal $821,480, less $80,250, which represents defendant’s interest in the Freeport house, for a total distributive award of $741,230. The amount shall be payable over three years with interest at 10% per annum (Schussler v Schussler, 109 AD2d 875). The payments shall be made semiannually commencing October 1, 1985, and the defendant shall have the right to prepay the award with interest to the date of payment.
Defendant is directed to convey his interest in the Freeport residence to plaintiff within 30 days after entry of judgment.