BERNICE WEGMAN, Appellant-Respondent, v EDWIN WEGMAN, Respondent-Appellant.

Second Department, December 1, 1986

### APPEARANCES OF COUNSEL

*Jerome R. Halperin, P. C. (Alice Slater* on the brief), for appellant-respondent.

*Taylor, Atkins & Ostrow (Michael J. Ostrow* and *Carol S. Eisenberg* on the brief), for respondent-appellant.

### OPINION OF THE COURT

Brown, J. P.

This case gives us the opportunity to consider the "troublesome matter of what is the proper date for valuing marital property" under the Equitable Distribution Law *(see, Litman v Litman,* 123 AD2d 310).

### I

The plaintiff Bernice Wegman, who at the time of the commencement of this action was 60 years of age, married the defendant Edwin Wegman, who is one year her senior, on June 20, 1943, in Brooklyn, New York. At the time of their marriage, Mrs. Wegman was completing her studies toward a Master's degree in social work and Mr. Wegman, who had a Master's degree in public administration, was employed as an organization and methods specialist by the Federal Govern-

ment in Washington, D.C. Following their wedding, Mrs. Wegman joined her husband in Washington and, during the following two years, worked as a probation officer. Thereafter, she took a position as a social worker.

In February 1947, Mr. Wegman learned that his position was being phased out, and, in June 1947 the parties returned to New York and moved in with Mrs. Wegman's parents. Mr. Wegman began working for the S.J. Wegman Company, a mail-order business which had been owned and operated by Mr. Wegman's uncle, Samuel J. Wegman, until his death in the latter part of 1946. At that time, the assets of the business passed by intestacy to the uncle's seven nieces and nephews, among whom were Mr. Wegman and his three brothers.

Upon the Wegmans' return to New York, Mrs. Wegman resumed full-time employment as a social worker. According to Mrs. Wegman's trial testimony, which was disputed by her husband, she provided all of the couple's support from the time of her return to work in November 1947 until January 1949, since her husband was unable during that period to draw any money from the S.J. Wegman Company.

In January 1949, Mrs. Wegman stopped working and the couple moved from Mrs. Wegman's parents' home into their own apartment. Shortly thereafter, Mrs. Wegman became pregnant and the couple's first child, Mark, was born in November 1949. Mrs. Wegman stayed at home to care for the child.

Sometime during 1952, the Wegmans received a settlement of approximately $25,000 resulting from their involvement in a 1947 automobile accident, most of which was used as a down payment on a newly constructed house in Freeport, New York. In August 1954, the Wegmans moved into their new home, and during the following November a second child, Thomas, was born.

In 1957, Mrs. Wegman resumed her employment as a social worker, initially working only one day each week, but gradually increasing her hours until by 1966 she was employed on a full-time basis.

During the late 1960's the Wegmans apparently began experiencing marital difficulties. Discussions with marriage counselors failed to improve their situation, and, in September 1972, Mr. Wegman left the marital home and moved into his own apartment. According to Mrs. Wegman, she discussed the possibility of reconciliation with her husband on many occa-

sions, but was continually rebuffed. Mr. Wegman acknowledged that telephone conversations took place between the parties, but stated that they always concerned money and that there was never any mention of a possible reconciliation.

In June 1973, Mr. Wegman began an action for a divorce, claiming cruel and inhuman treatment and constructive abandonment. A jury trial was held in April 1977, following which the action was dismissed upon the merits. At some point during the pendency of that action, it appears that Mr. Wegman obtained a Haitian divorce decree but he never attempted to establish the validity of that decree in New York.

In July 1981, Mrs. Wegman commenced the instant action for divorce, and on December 6, 1983, the defendant's motion for reverse partial summary judgment was granted on the plaintiff's cause of action for a divorce on the ground of abandonment. A trial on economic issues was held in March 1985. Much of the testimony at trial dealt with the valuation of the S.J. Wegman Company, and its various holdings, which by then was controlled by Mr. Wegman.

The S.J. Wegman Company began, as heretofore indicated, as a mail-order business operated as a sole proprietorship by Mr. Wegman's uncle, Samuel J. Wegman. When Mr. Wegman's uncle died intestate in October 1946 his estate, including the assets of the mail-order business, passed in equal shares to Mr. Wegman, his three brothers, and their three cousins. Following the uncle's death, the business remained in operation and continued to produce a small return. In 1947, the four Wegman brothers bought out their cousins, paying them $7,200 for their three-sevenths share. Each brother was to contribute $1,800, but, since Mr. Wegman did not have the necessary funds, one of his brothers gave him a gift of $1,800 in order that he could pay for his share. In 1947, his brothers stepped aside and Mr. Wegman took control of the operation of the business.

Initially, Mr. Wegman and his brothers had no formal financial arrangement governing their respective interests in the business. According to Mr. Wegman, he and his brothers had an understanding that the business principally belonged to him since it was he who was involved in its day-to-day operation and who built it up following their uncle's death. Mr. Wegman testified that he "took what [he] needed" from the business and from time to time his brothers took "small

amounts" therefrom. It was not until February 1969 that a written partnership agreement was entered into which provided that Mr. Wegman would have an 85% share of the profits and losses and each of his three brothers would have a 5% share therein. At the trial, it was conceded that Mr. Wegman's interest in the S.J. Wegman Company at that time amounted to 85% thereof.

The business prospered under Mr. Wegman's direction. It expanded into a number of new products and in 1951, it formed the Honor House Products Corp. (hereinafter Honor House) to conduct the mail-order business in a corporate form. All of the stock of Honor House was owned by the S.J. Wegman Company. In 1953, the company constructed its own building in Lynbrook, New York, and another corporation, the Wilbur Street Corporation (hereinafter Wilbur Street) was formed in 1952 to acquire title to the building.

In 1957, the S.J. Wegman Company formed a wholly owned subsidiary corporation called Agricultural Biologicals Corp. (hereinafter ABC) to develop and market gibberellic acid, a substance which stimulates growth in plants. This product proved unsuccessful and was subsequently abandoned. However, as a result of this effort, Mr. Wegman's attention was called to collagenase, a substance used to treat skin ulcers, burns and bedsores. The company used profits from the mail-order business to develop collagenase, and changed the name of ABC to Advance Biofactures Corporation.

In 1965, ABC received approval from the Food and Drug Administration to market collagenase. However, the product was not actively marketed until 1972. Ultimately, collagenase became an extremely successful product and, by the time of trial, accounted for 95% of ABC's income. The mail-order business became much less significant and finally, in 1983, all of the assets of Honor House were sold for the amount of its liabilities. ABC used much of the money earned from the sale of collagenase for the research and development of new drugs (over $5,000,000 in a seven-year period).

During the 1960's, a number of outside investors, including Mrs. Wegman's father and some of the Wegmans' neighbors, invested in ABC stock. In 1969 and again in 1972, ABC attempted to sell its shares to the general public. Both efforts, however, were eventually abandoned. As a result, the S.J. Wegman Company continued to own 70% of ABC's shares. By the time of trial, ABC employed about 60 people, had four subsidiaries, and had retained earnings of nearly $3,000,000.

The role played by Mrs. Wegman in the growth of her husband's business holdings was a matter which was sharply disputed at trial. According to Mrs. Wegman, she was required to totally support her husband and herself until January 1949 and always contributed all of her earnings toward the expenses of the household. She claimed that she had suggested new products to be sold and sought out new employees, including her cousin's husband, who had worked in a medical laboratory. She also stated that she entertained large numbers of business guests on an average of twice per month, doing all of the planning, preparing, and cooking herself. She testified that she obtained investors from among her acquaintances and became active in civic affairs in order to meet people who might be helpful to her husband in his business.

Not surprisingly, Mr. Wegman testified that his wife's contributions to the growth of the business had been minimal. He stated that he and his wife "rarely" entertained business associates, although he did admit that they frequently socialized with "friends", some of whom they had met through his wife's civic involvement. He acknowledged that some of these individuals had invested in his business. He also acknowledged that his wife had introduced him to an advertising agent whom he had employed for a brief period. Mr. Wegman claimed that his wife's earnings were not contributed to the household, but instead were used to pay for her own clothing and for the services of a full-time maid.

The parties presented extensive and conflicting expert testimony concerning the value of Mr. Wegman's business holdings. The principal assets valued by the parties' experts were ABC, Honor House, Wilbur Street, the marital residence in Freeport and another residence located in Hewlett Bay Park, New York, that Mr. Wegman had purchased in 1974 and in which he was living at the time of trial. Some of the parties' assets were valued by their respective experts at multiple dates at the request of the trial court.

Mrs. Wegman's expert, Walter L. Zweifler, testified that as of December 1, 1984, the market value of ABC, including its subsidiaries, was $10,000,000. Because he owned 85% of the S.J. Wegman Company, which in turn owned 70% of ABC, Zweifler calculated that Mr. Wegman's interest in ABC was worth $6,545,000. He used a capitalization of earnings approach, adding the value of a securities portfolio owned by the corporation to the figure obtained from capitalizing ABC's

average earnings in order to arrive at the corporation's total value. Zweifler found that ABC had been worth $7,250,000 in January 1982, six months after commencement of the action, and he valued Mr. Wegman's interest at that time at $4,750,000. On January 31, 1973, according to Zweifler, Mr. Wegman's share of ABC was worth $2,500,000.

Mr. Wegman's expert testimony with respect to the value of ABC was provided by his accountant, Seymour G. Stein. Stein did not compute the value of ABC as of the date of trial, but stated that it would not have changed significantly from January 31, 1982, when Mr. Wegman's share of ABC was, in Stein's opinion, worth $440,392. Stein used a liquidation-value method and deducted certain assessments by the Internal Revenue Service that the corporation was contesting. Applying similar methods, Stein determined that ABC was worth $39,616 in January 1973 and that Mr. Wegman's interest in the corporation was $22,232.

There was a similar divergence of opinion concerning the value of Honor House. Zweifler testified that Honor House's value in 1973 amounted to $577,500. Stein, on the other hand, placed the corporation's value at $170,000 as of that date. There was no testimony concerning the value of Honor House at any other time.

The opinions of the parties' experts differed to a somewhat lesser degree with respect to the value of the parties' real estate holdings. Mrs. Wegman's appraiser, Norman Hanlon, testified that her husband's business property, consisting of a one-story warehouse and industrial building with office space, was worth $325,000 as of January 1982 and that in January 1985 its value was $465,000. Mr. Wegman's expert, Jay Tannenbaum, testified that the property was worth $203,833 in August 1972, $370,500 in August 1981, and $393,500 in August 1984.

Mrs. Wegman's expert witness, Kenneth Rossman, stated that the Freeport residence, which the parties owned as tenants by the entirety, was worth $111,000 in December 1981 and $147,000 in December 1984. He valued the Hewlett Bay Park home at $417,000 as of December 1981 and $550,000 as of December 1984. Mr. Wegman's expert, Margery Hausman, concluded that the marital residence was worth $55,000 in 1973, $90,000 in 1981 and $174,000 in December 1984. She valued the Hewlett Bay Park property at $350,000 as of December 1981 and $525,000 as of December 1984.

It appears that Mr. Wegman's remaining assets consisted of a profit-sharing plan and securities portfolio valued at approximately $98,000 and that in addition to her interest in the Freeport house, Mrs. Wegman's assets consisted of $4,000 in a credit union account, an automobile purchased in 1981, a $5,000 municipal bond, 5,500 shares of ABC stock that she had inherited from her father, and pension benefits valued at approximately $128,000 as of December 1984. At the time of trial, Mrs. Wegman was employed as an administrative supervisor in a hospital and was earning a yearly salary of $43,000.

In its decision following trial *(Wegman v Wegman,* 129 Misc 2d 968), the court granted Mrs. Wegman a distributive award of $741,230. It determined that Mr. Wegman's business holdings were separate property since his initial interest in the S.J. Wegman Company was the result of an inheritance from his uncle and a gift from his brother. In the court's view, Mrs. Wegman was therefore entitled only to a percentage of the appreciated value of the business during the marriage and then only to the extent that such appreciation could be attributed to her contributions thereto. Since the parties had not lived together after 1972, the trial court concluded that Mrs. Wegman had done nothing to contribute to the appreciation of the business after that date and it therefore valued the business as of September 1972, the date of the parties' separation. The court accepted the testimony of Mrs. Wegman's expert concerning the value of Honor House ($577,500) and the testimony of Mr. Wegman's expert concerning the value of the Wilbur Street property ($203,833 with an outstanding mortgage of $56,500). It rejected the testimony of both experts regarding the value of ABC and determined that that corporation had a value of $1,998,000 basing its decision on a December 20, 1972 transaction in which ABC satisfied a debt owed to the S.J. Wegman Company by tendering stock which the corporation valued at $5 per share. The court then determined that Mr. Wegman's total interest in the business entities making up the S.J. Wegman Company amounted to $1,842,312 at the time of the Wegmans' separation in 1972, of which $1,825,512 represented appreciation over the original value of $16,800. The $16,800 figure was derived from the 1947 transaction in which Mr. Wegman and his three brothers bought out their three cousins. Based on her direct and indirect contributions to the appreciation, the court determined that Mrs. Wegman's equitable share of this increase was 45% or $821,480. This figure was offset by Mr. Wegman's share of the

value of the marital residence ($80,250), to arrive at the net award of $741,230. The parties were permitted to retain their respective interests in their stock portfolios and pension plans.

The court further found that the Hewlett Bay Park home was Mr. Wegman's separate property since it had been purchased after the commencement of his unsuccessful divorce action in 1973. The court observed that the parties had not cohabited after that date and concluded that the marriage was "irretrievably broken" at that time. The court was thus of the opinion that any property purchased thereafter was separate property, notwithstanding the fact that the prior divorce action was eventually dismissed on the merits.

Finally, the court directed that the distributive award to Mrs. Wegman be paid over three years, with interest at 10% per annum, and it awarded Mrs. Wegman the sum of $15,000 in counsel fees. Both sides have appealed. For the reasons that follow, we have concluded that the award made in this case was erroneous and that the matter must be remitted to the trial court for a new determination.

## II

Preliminarily, we must determine whether the trial court was correct in its holding that Mr. Wegman's business interests constitute separate property.

Domestic Relations Law § 236 (B) (1) (d) provides, in pertinent part, as follows:

"The term separate property shall mean:

"(1) property acquired before marriage or property acquired by bequest, devise, or descent, or gift from a party other than the spouse * * *

"(3) property acquired in exchange for or the increase in value of separate property, except to the extent that such appreciation is due in part to the contributions or efforts of the other spouse".

In enacting the Equitable Distribution Law, the Legislature rejected traditional definitions of property in favor of an expanded concept which recognizes that marriage is, among other things, an economic partnership and that spouses have an equitable claim to things of value arising out of that partnership (see, O'Brien v O'Brien, 66 NY2d 576, 583; Conner v Conner, 97 AD2d 88, 107 [Bracken and Brown, JJ., concurring in the result]). It thus created "marital property", a

creature of statute which bears no resemblance to any common-law property interest and which "is of no meaning whatsoever during the normal course of a marriage[, arising] full grown, like Athena, upon the signing of a separation agreement or the commencement of a matrimonial action" *(Conner v Conner, supra,* at p 107, quoting from Florescue, *"Market Value", Professional Licenses and Marital Property: A Dilemma in Search of a Horn,* NY St Bar Assn Fam L Rev 13 [Dec. 1982]). "Marital property" was given a broad and comprehensive definition and property was classified by focusing on the marital status of the parties at the time of acquisition rather than on the form in which title to the property was held *(O'Brien v O'Brien, supra; see generally,* 3 Foster-Freed-Brandes, Law and the Family New York—Equitable Distribution, ch 2, at 31 [2d ed]). In creating a narrow exception for separate property, the authors of the Equitable Distribution Law reasoned that, if marriage is to be treated as an economic partnership, property which is not the product of that partnership should not be regarded as partnership property (Scheinkman, 1981 Practice Commentary, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law C236B:4, p 204 [1986 Supp Pamph]). Excluding property acquired by gift or inheritance from marital property is consistent with the statutory rationale since such property cannot be considered to have been the product of the marital enterprise *(Brennan v Brennan,* 103 AD2d 48, 52).

In the instant case, the trial court determined that the husband's business holdings were separate property because his initial interest therein was acquired through inheritance and by gift. While we agree that a portion of his interest in the S.J. Wegman Company and its holdings falls within the statutory definition of separate property as set forth in Domestic Relations Law § 236 (B) (1) (d), we do not agree that all of Mr. Wegman's holdings in the company were separate property. As one of the seven distributees of his uncle's estate, one of the assets of which was the mail-order business, Mr. Wegman acquired a one-seventh interest in the business by descent. He received an additional interest in exchange for the gift of $1,800 from his brother. Since all of the brothers made equal contributions to the acquisition of the share of the business held by their cousins, it is apparent that, at least initially, the four Wegman brothers held equal interests in the S.J. Wegman Company. Thus, in 1947, Mr. Wegman held a

25% interest in the company and this 25% interest was his separate property.

Of course, a finding that 25% of S.J. Wegman Company was Mr. Wegman's separate property does not preclude an award to Mrs. Wegman of a share of the value of that interest. The testimony at trial clearly reflects that the value of that interest appreciated considerably over the years. The trial court found, and the record supports the conclusion, that Mrs. Wegman contributed to the appreciation of that interest and she is therefore entitled to an award of a percentage of the appreciation of that separate asset, having shown that her direct and indirect contributions to the marital relationship were causally related to the enhancement in value of the business *(see, Price v Price,* 113 AD2d 299).

■ By the time of trial, however, Mr. Wegman's share of the business was not 25% but rather had increased to 85%. Mr. Wegman's uncontradicted testimony at trial was that his additional share of the company received from his brothers was a reflection of the efforts that he had expended in building up the business. Thus, in effect, Mr. Wegman had been compensated for his labors by the receipt of a greater share of the business. Such an acquisition was clearly the product of a functioning marital partnership and falls squarely within the definition of marital property *(see,* Domestic Relations Law § 236 [B] [1] [c]; *Majauskas v Majauskas,* 61 NY2d 481). Thus, the 60% share of the S.J. Wegman Company acquired by Mr. Wegman from his brothers subsequent to the parties' marriage was marital property and not merely appreciation of separate property and it was error to calculate Mrs. Wegman's award based solely upon a percentage of the appreciation in the value of the business which could be attributed to her contributions.

### III

We now turn to what has been referred to as one of "the most perplexing and difficult problems created by the Equitable Distribution Law"—the issue of the date to be used for the valuation of marital property *(see,* 3 Foster-Freed-Brandes, Law and the Family New York—Equitable Distribution, ch 14, at 587-588).

Those who drafted the Equitable Distribution Law did not provide express guidance as to the date at which the value of marital property should be measured (Scheinkman, 1984 Prac-

tice Commentary, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law § C236B:32, p 117 [1986 Supp Pamph]). Instead, the matter was left to the courts to resolve. "The question of valuation date is of prime importance since, in complicated matters and in the urban areas of the state, protracted pretrial proceedings and calendar delays can mean that months, if not years, will pass between the commencement of the action and the time of trial. In that time, property values may not—and probably will not—remain constant" (Scheinkman, 1984 Practice Commentary, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law § C236B:32, p 117 [1986 Supp Pamph]).

In *Damiano v Damiano* (94 AD2d 132), we decided the question of the manner by which a court might properly value a pension benefit. We held that there were two methods by which the rights of the nonpension member spouse could be enforced. The first method would be to award a lump sum, calculated by determining the present value of the pension benefits at the time of the divorce, the percentage of that value attributable to the period between the date of the marriage and the commencement of the divorce action, and the appropriate equitable share to which the nonmember spouse is entitled. The second method suggested is to award the nonmember spouse a specific share of the periodic pension benefits that the member spouse would receive in the future *(Damiano v Damiano, supra,* at p 139; *see also, Majauskas v Majauskas,* 61 NY2d 481, 483, *supra; McDermott v McDermott,* 119 AD2d 370).

With respect, however, to assets other than pensions, we have generally considered valuation issues on a case-by-case basis and have determined valuation dates appropriate to the particular circumstances presented. For example, in *Bofford v Bofford* (117 AD2d 643) we held that the trial court had properly valued the marital property, which included the husband's business, as of the date of commencement of the action and that it had properly considered postcommencement events in its determination. Similarly, in *Bara v Bara* (115 AD2d 628), we found no error in the trial court's valuation of a vested thrift plan as of the date the action was commenced. In *Rywak v Rywak* (100 AD2d 542), a case involving the distribution of a bank account, we held that the date of commencement of the action was the appropriate valuation date in view of the fact that there had been a number of withdrawals from the account subsequent thereto.

Where the asset to be valued is the marital residence, we have generally held that the valuation date employed should be the date of trial *(see, e.g., Sorrentino v Sorrentino,* 116 AD2d 564; *Griffin v Griffin,* 115 AD2d 587; *Barnes v Barnes,* 106 AD2d 535). The purpose of using this date is to avoid the injustice to one spouse which could result from either appreciation or depreciation in the value of the residence between the date of commencement of the action and the date of trial *(see, Sorrentino v Sorrentino, supra).* Similar considerations underlie our recent decision in *Lobotsky v Lobotsky* (122 AD2d 253) in which the trial court had ordered that the marital home be sold at its fair market value as of the date upon which the action had been commenced. We determined that this direction was erroneous and held that the house should be sold for its fair market value at the time of sale and that the proceeds should then be distributed between the parties. *Antis v Antis* (108 AD2d 889) is a further example of the flexible approach that we have adopted with respect to valuation issues. There, we held that the trial court had erred in failing to distribute retirement trust benefits which had accrued during the parties' 28-year marriage. We conclude that the wife was entitled to an amount equal to one half the balance in the fund on the date of entry of the judgment.

A review of the decisions of other courts in this State similarly provides no definitive rule to be used in the resolution of valuation issues. In *Matter of Ward v Ward* (94 AD2d 908) it was held that the marital residence was properly valued as of the date of commencement of the action. In *Muller v Muller* (116 Misc 2d 660) the court used the same date for the valuation of marital property as it used to identify such property—in that case, the date of commencement of a prior divorce action which was subsequently withdrawn. Many courts have valued assets at the time of trial *(see, e.g., Roffman v Roffman,* 124 Misc 2d 636 [cooperative apartment]; *Stein v Stein,* NYLJ, Aug. 19, 1982, p 12, col 3 [machine shop business]; *Martinez v Martinez,* NYLJ, Oct. 13, 1981, p 17, col 5 [residence]).

In other jurisdictions in which the equitable distribution of marital property is provided for, there similarly has been no clear judicial consensus as to the date to be employed in the valuation of marital assets. In some States, the date of trial is used *(see, e.g., Walter W.B. v Elizabeth P.B.,* 462 A2d 414 [Del]). In others, courts utilize the date at which the divorce is granted *(see, Holbrook v Holbrook,* 103 Wis 2d 327, 309 NW2d

343; *Cotter v Cotter,* 58 Md App 529, 473 A2d 970). Many states have declined to fashion a rigid rule, holding that the date of valuation is to be determined by the trial court after considering all of the circumstances of the particular case *(see, e.g., Berish v Berish,* 69 Ohio St 2d 318, 432 NE2d 183; *Bollenbach v Bollenbach,* 175 NW2d 148 [Minn]; *In re Marriage of Hitchcock,* 309 NW2d 432 [Iowa]; *In re Marriage of Wagner,* — Mont —, 679 P2d 753; *Curylo v Curylo,* 104 Mich App 340, 304 NW2d 575). The justification for this reluctance to create a simple formula for property division was well expressed by the Supreme Court of Wisconsin in *Lacey v Lacey* (45 Wis 2d 378, 383, 173 NW2d 142, 145): "The formula for division derives from the facts of the individual case. If it is argued that this approach gives great leeway and also places a heavy responsibility on trial courts in divorce cases, there is no gainsaying that fact. However, both flexibility and responsibility are called for by the endless variety of human situations that come to court in family cases. No two are exactly alike." Other courts have explained that in order to achieve a truly equitable division of marital property, a court must be given the flexibility to utilize alternative valuation dates where reasonable under the facts presented *(see, Berish v Berish, supra).* Since the value of one asset might change drastically during the course of the dissolution of a marriage, while the worth of another remains stable, some courts have stated that there is discretion to employ different valuation dates for different assets *(see, Lippert v Lippert,* — Mont —, 627 P2d 1206).

The issue of valuation has been the subject of much discussion among the commentators in the matrimonial area, with most in agreement on the need for flexibility *(see,* Greenhaus, *Valuation of Marital Property: Choosing an Appropriate Valuation Date,* 16 Fam L Rev 6-8 [Mar. 1984]; Samuelson, *Notes and Comments,* 15 Fam L Rev 1-2 [Dec. 1983]; Florescue, *Current Cases and Their Implications,* NYLJ, Jan. 16, 1984, p 3, col 1; Foster and Freed, *Law and the Family,* NYLJ, Nov. 3, 1986, p 1, col 1; *see also,* Scheinkman, 1986 Practice Commentary, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law C236B:26). The main concern expressed is that the prescribing of a fixed date as the date of valuation may be so unjust and inequitable that the entire purpose of the statute could be defeated. Indeed, it is apparent that in many situations a rigid rule regarding the valuation date would be undesirable.

For example, one date frequently mentioned as a date to be utilized for valuation is that of the date of the commencement of the matrimonial action. The valuation date would, in most cases, then coincide both with the date at which marital property is identified (see, Domestic Relations Law § 236 [B] [1] [c]) and with the date at which a pension is valued (see, *Damiano v Damiano,* 94 AD2d 132, *supra).* However, the rule could lead to injustice if the asset has significantly increased or decreased in value between the date of commencement and the date of trial of the action. If an asset increases in value due to market forces or inflation, valuation as of the date of commencement of the action would result in a windfall to the titled spouse and injustice to the other. If the asset greatly decreased in value, as would be the case, for example, if a closely held corporation lost a major customer, a court which values assets at the date of commencement of the action might make a distributive award that is beyond the owner spouse's ability to pay (see, Scheinkman, 1986 Practice Commentary, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law § C236B:26).

A rule requiring valuation at the time of trial could be equally unworkable. In some cases, practical problems could arise if proof of value at the date of trial is unavailable. Injustice could result if the value of an asset significantly decreased after commencement of the action due to wasteful dissipation or other fault of the owner spouse. In this type of circumstance, it might be unfair to, in effect, force the blameless spouse to share a portion of the loss. An asset such as, for example, a business, might suddenly appreciate in value due solely to the efforts of the owner spouse. If a considerable period of time has elapsed since the date of commencement or the date of separation, the court might be justified in establishing a valuation date earlier than the date of trial. A "fixed valuation date can never obviate all ills, depending upon what side of the fence one may position himself" (Samuelson, *Notes and Comments,* 15 Fam L Rev 2).

After reviewing and considering all of the cases and authorities in this area, we have concluded that there can be no strict rule mandating the use of a particular valuation date and that a trial court must have the discretion to select a date appropriate to the case before it in light of the particular circumstances presented. As was stated in the Assembly memorandum accompanying the equitable distribution legislation in 1980: "An important aspect of this legislation is the flexibil-

ity which is incorporated due to the tremendous variation in marital situations and the equities involved. Flexibility, rather than rigidity is essential for the fair disposition of a given case" (1980 NY Legis Ann, at 130). But that is not to say that guideposts should not be erected to provide some degree of direction in this area since, as a result of the absence of a general rule regarding asset valuation in New York, "[t]his area of law has been fraught with confusion" (Scheinkman, 1986 Practice Commentary, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law § C236B:26).

Some authorities have suggested that a presumption in favor of a particular date should be established but that a court should have the freedom to use another date if "good cause" is shown. One such proposal, resting upon the view that a marital partner withdraws from a marriage when he or she serves a summons (see, Samuelson, *Notes and Comments,* 15 Fam L Rev 1), suggests that a court should value marital property at the date of commencement of the action unless the use of such a date would result in inequity. Other authorities favor a date of valuation close to the time of trial or distribution (see, e.g., *In re Marriage of Krause,* — Mont —, 654 P2d 963), arguing that by using present values, a court is in the best position to achieve the goal of equitable distribution—the fashioning of truly equitable awards consistent with the legitimate expectations of the parties (see, *Berish v Berish,* 69 Ohio St 2d 318, 432 NE2d 183, *supra).*

In many cases valuation of marital assets as of a date as close to the time of trial as practicable will result in an award which is fair to both parties. As has heretofore been pointed out, there frequently may be a substantial lapse of time between the date of commencement of the action and the date of trial. For example, in the case before us, over 3½ years elapsed between the commencement of this action by Mrs. Wegman in July 1981 and the trial of the economic issues in March 1985. During a delay of this kind, many assets, particularly businesses such as that involved in the case at bar, may experience fluctuations that might dramatically change the logic of the distribution. Under such circumstances, the valuation of assets close to the time of trial may result in the formulation of an award consistent with the purpose of equitable distribution and insure that each spouse receives a fair share of the family assets accumulated while the marital relationship endured (see, *Price v Price,* 113 AD2d 299, *supra; see also,* Scheinkman, 1986 Practice Commentary, McKinney's

Cons Laws of NY, Book 14, Domestic Relations Law § C236B:26; Foster and Freed, *Law and the Family*, NYLJ, Nov. 3, 1986, p 1, col 1).

However, in other cases circumstances may exist which would justify the use of a valuation date closer to the time of commencement of the action. As we have already mentioned, a sharp increase in the value of a marital asset due solely to the efforts of the owner spouse might be such a circumstance. Similarly, a dramatic reduction in value due to dissipation or wasteful conduct of the owner spouse might justify the use of a date earlier than the date of trial. These examples, of course, are not exclusive. Furthermore, recognition may be given to the principle which is the basis of the Equitable Distribution Law, namely, that the concept of "economic partnership" rests upon the existence of an underlying and continuing marital relationship.

In the last analysis, the date chosen must be tailored to the particular facts involved in each case and must be reflective of the legislative mandate to provide for the equitable distribution of the assets of the marital partnership.

We note that our approach is consistent with the Legislature's recent amendment to Domestic Relations Law § 236 (B) (L 1986, ch 884, § 2, adding § 236 [B] [4] [b]). The new paragraph, which applies only to matrimonial actions commenced on or after September 1, 1986, and is thus inapplicable to the case at bar, reads as follows: "As soon as practicable after a matrimonial action has been commenced, the court shall set the date or dates the parties shall use for the valuation of each asset. The valuation date or dates may be anytime from the date of commencement of the action to the date of trial." The purpose of the statute is to streamline the litigation process by letting the parties know, in advance of the trial, the date to be used for valuation purposes so that they may gear their trial preparation accordingly (NY St Assembly mem in support of legislation, L 1986, ch 884; Scheinkman, 1986 Practice Commentary, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law § C236B:26). It is notable that, while the statute requires the court to set valuation dates "[a]s soon as practicable after a matrimonial action has been commenced", with the exception of the requirement that the valuation date be between the date of commencement of the action and the date of trial, the amendment places no restrictions upon the discretion of the court in choosing any appropriate valuation date or dates. A court may set different

valuation dates for different assets, may take into consideration transfers and dissipations by a spouse seeking to hinder equitable distribution, and may change a valuation date after it is set if equity so requires (see, NY St Assembly mem in support of legislation, L 1986, ch 884).

In the case before us, we find no special circumstances which would justify the use of the date of the parties' separation, nearly nine years prior to the commencement of the within action, as the valuation date for Mr. Wegman's business holdings. To the contrary, we find that the valuation by the trial court of the S.J. Wegman Company at the time of separation so distorted the parties' economic situation as to result in an unfair distribution of assets. The expert testimony presented during trial makes clear that the value of the business increased substantially during the period of the parties' cohabitation and that it continued to grow subsequent to the separation. The rapid increase in value after the separation was not due to any change in the direction of the business or other cause which could be attributed solely to the efforts of Mr. Wegman. Rather, it was due to the successful marketing of collagenase, a product which was developed during the 1960's, a period of time during which Mrs. Wegman contributed to her husband's success by maintaining the marital residence, raising the couple's children, entertaining her husband's business associates, attracting investors and new employees to the business, and contributing her own earnings to the household, as well. Since Mrs. Wegman made substantial contributions to the economic partnership during the period of the development of collagenase, she should not be deprived of a share of the wealth eventually generated by that substance merely because her husband chose to abandon her in the same year that the S.J. Wegman Company began to market it. We therefore conclude that the business should have been valued at a date close to trial and remit the matter to the trial court for a new distributive award to be determined in accordance with Domestic Relations Law § 236 (B) (5) (d) and (e).

## IV

Our decision herein renders discussion of the parties' remaining contentions unnecessary, except in two brief respects.

Firstly, upon remittitur, the trial court should make a factual finding as to the source of the funds used to acquire

the Hewlett Bay Park home and whether, and to what extent, said funds were marital or separate property. Absent such determination, we leave unresolved the question of whether the commencement of Mr. Wegman's prior unsuccessful matrimonial action served as the cutoff date at which the couple's marital property should be identified (Domestic Relations Law § 236 [B] [1] [c]; cf. Lennon v Lennon, 124 AD2d 788). Secondly, we would point out that since the amount of the counsel fee awarded to Mrs. Wegman was based upon an erroneous distributive award, it would be appropriate that the issue of counsel fees be reconsidered by the trial court upon its determination of a new award.

Accordingly, the judgment appealed from should be modified by deleting the second, third and fifth decretal paragraphs thereof, and the matter should be remitted to the Supreme Court, Nassau County, for further proceedings consistent herewith.

RUBIN, LAWRENCE and KOOPER, JJ., concur.

Ordered that the judgment of the Supreme Court, Nassau County, entered September 24, 1985, is modified by deleting the second, third and fifth decretal paragraphs thereof. As so modified, the judgment is affirmed insofar as appealed from, without costs or disbursements, and the matter is remitted to the Supreme Court, Nassau County, for further proceedings consistent with the opinion herewith.

(Motion to Amend Remittitur Granted,<br>February 23, 1987)

Motion by the plaintiff wife to amend the remittitur of an order of this court, dated December 1, 1986 which determined her appeal and the defendant husband's cross appeal from a judgment of the Supreme Court, Nassau County, entered September 24, 1985.

Ordered that the motion is granted to the extent that the order of this court is amended by deleting therefrom the words "for further proceedings, consistent with the opinion herewith", and substituting therefor the words "(1) to value the defendant husband's business holdings based upon the evidence adduced at the trial of this action held in March 1985 at a date as close to the date of said trial as possible, and (2) for a new trial to determine the issue of whether the home in Hewlett Bay Park is in whole or in part marital property and, upon the completion of the valuation of the defendant's

business holdings and the new trial with respect to the home in Hewlett Bay Park, for the making of a new distributive award accordingly"; and it is further,

Ordered that the concluding paragraph of the opinion of Brown, J. P., is amended accordingly.

The issue presented on this motion is whether the decision of this court dated December 1, 1986, necessitates a new trial to determine the value of the defendant husband's business holdings. We conclude that it does not. During the trial of this action in March 1985 the Trial Judge repeatedly emphasized the importance of submitting evidence as to the value of the parties' assets at all the critical dates. The court's express purpose in requiring such testimony was to avoid the necessity of a new trial should an appellate court disagree with the valuation date chosen by the Trial Judge. As a result of these instructions, the parties were given the opportunity to present evidence concerning the value of their respective assets at various dates, including the date of the parties' separation, the date of commencement of the action and a date close to the date of trial. Since the record made at trial was complete, at least with respect to the value of the defendant husband's business holdings, there is no need to take further testimony with respect to those assets. Our remittitur to the trial court for a determination as to the value of the business holdings is not a reflection of a need for further evidence but rather a recognition of the fact that the determination is dependent upon the court's evaluation of the credibility of competing expert witnesses. The Trial Judge, who had the opportunity to observe those witnesses and listen to them testify, is, of course, in the best position to make such a determination. Where the parties have had a full opportunity to present all relevant evidence, to conduct a new trial would be an unnecessary and wasteful use of the limited resources of the court.

As noted in the opinion of Brown, J. P., however, a new trial is required on the issue of whether the home in Hewlett Bay Park is, in whole or part, marital property, and, if it is, as to the value of that marital property.

Upon the completion of the valuation of the husband's business holdings based on the record of the prior trial and the conclusion of the new trial as to the Hewlett Bay Park home, the court shall make a new distributive award.

BROWN, J. P., LAWRENCE, RUBIN and KOOPER, JJ., concur.